STATE OF MAINE
*vs.*
CARL PETERSON

Aroostook.   Opinion, August 11, 1950.

*James Archibald,* for State.

*Donald Sweeney,*
*Asa Roach,* for respondent.

SITTING: MURCHIE, C. J., THAXTER, FELLOWS, MERRILL, NULTY, WILLIAMSON, JJ.

MURCHIE, C. J.   This case presents an appeal by the respondent from the denial of his motion for a new trial, fol-

lowing a verdict of guilty of manslaughter, on an indictment alleging murder, and exceptions to the admission and exclusion of certain items of evidence. Two of the exceptions relate, respectively, to the admission in' evidence, as exhibits, of three photographs of the person alleged to have been killed and a statement signed by the respondent, in the nature of a confession, declaring that he put lye in a glass of beer drunk by the decedent, intending to kill two men. That confession represents the only evidence in the record connecting him with the alleged killing, except subsequent verbal admissions consistent with it which can give it no additional force. He was one of nine persons, including the decedent, who were in the room where the beer was dispensed some part of an approximate hour before the death occurred. It resulted from the ingestion of the strong caustic contained in the lye. The other exceptions challenge the exclusion of two items of evidence offered on behalf of the respondent.

The appeal is sustained. Consideration of it involves both the photographs and the confession, but not the issue of the propriety of admitting them in evidence. There seems to be no necessity for considering the evidence excluded.

The case involves the death of Yvonne Pelletier Poitras, in the kitchen of the home of her father, at or about midnight on November 20, 1948, in the presence of the eight persons who had gathered there with her, an hour or more earlier, to prepare and enjoy a chicken stew. These included the father, mother and brother of Yvonne, an aunt and a friend of the aunt, all of whom, with Yvonne and the respondent, had been together for some hours. The two others were men who had joined the group in a restaurant, shortly before it started for the Pelletier home. These are the men the respondent intended to kill, according to his signed statement. One of them was an acquaintance of

Yvonne, the other a stranger to all. They joined the party at the invitation of Yvonne.

The kitchen measured fifteen feet seven inches by eleven feet five inches. A sitting room adjoined it, access thereto being through an archway seventy-three inches wide. In the kitchen were a cook stove, two tables, six chairs, and a small heating stove, the latter located near the archway, to furnish heat for the sitting room. Along one wall were a sink, with a cupboard below and a shelf above. The smaller of the two tables was on the right of it. The shelf and table play a most important part in the testimony. A can of lye, from which the poison must have been taken, was found on the table when the officers arrived, in a carton containing meats and groceries. All the evidence in the case relating to its location when the party entered the kitchen, except the declaration of the respondent in his written statement that he "knew there was some lye in the cupboard," indicates that while at some earlier time it had been kept in the cupboard under the sink, it had been taken therefrom and placed on the shelf something like two weeks earlier.

Along another wall were the cook-stove and a built-in cabinet containing four cupboards and three drawers, one of the cupboards being projected into the room the full depth of a shelf somewhat higher than a table, under which it was located. That shelf is referred to in the evidence as a sideboard. Above it were three smaller cupboards. The cupboard under the sink was enclosed by a door wide enough to make it improbable that the respondent could have swung it open into the room without being observed. There is no evidence that it was opened at any time while the party was in progress, although the fact that Yvonne's father opened the door of one of the cupboards over the sideboard to get the glasses used for the beer is established.

To complete the description of the room, although the case hinges on that already identified, there was a door giving access to the shed in the corner formed by the walls against

which the sink and stove were placed. A rocking chair filled some of that corner area. Along a third wall were the larger (dining) table and some chairs. The remaining wall divided the kitchen and the room to which the archway led.

An investigation was commenced late in the morning following the death and extended to midnight of that day. Each and every member of the party except of course the deceased girl was examined. Recesses were taken for meals at noon-day and in the early evening. At the former all were permitted to go free to seek food. At the latter, however, the respondent was locked up, "as a material witness." He was confined without food until late in the evening, when his examination, conducted by a considerable group of officers and lasting for a time estimated at from an hour and a quarter to three hours, began. Earlier in the day he had said, in answer to a question about the cause of death, that Yvonne had eaten some glass, a statement obviously wrong. When his turn to be questioned exhaustively came, he had become a suspect, as is apparent from the statements of the officers that he maintained his innocence for a long time. He did so until the exhibits challenged by the first exception were presented to him. These showed Yvonne lying in a corner of the kitchen, where she fell after a period of agony, with blood covering her features and a part of her clothing, and spreading over a section of the floor. The reaction of the respondent was immediate. Despite his consistent denials of guilt theretofore, he stated immediately "that he shouldn't have done it," exclaimed "I did it," and "went in some kind of a spell," a state of semi-consciousness, to quote one of the officers. Thereafter he was given water, with a suggestion that there might be lye in it, "the same thing you gave Yvonne," some doughnuts and coffee. Again quoting the officer, "after he had told us what he had done, he regained his posture." He was taken to another room where it is said that he told, twice, the full story related in his statement. This was typed out by an officer and read to

him. He signed it, as did two officers. It opens with declarations that he was advised of his constitutional rights (that he could not be compelled to make any statement that could be used against him in a criminal prosecution), and that he was speaking of his own free will and accord, without promise of favor or threats.

The second exception challenges the admission of the statement in evidence, on the ground that it was not voluntary. We do not deem it necessary to consider the issue raised thereby because, assuming the propriety of the ruling admitting it, its probative value, when weighed in the light of respondent's mentality, and with reference to the other evidence in the case, is not sufficient to establish his guilt beyond a reasonable doubt. The issue in that regard arises on the motion, and the appeal from its denial. The State's case must be held to rest entirely on the statement. If it is not adequate, in and of itself, the admissions already alluded to, made by the respondent while he was being transported to jail, offer no fortification of it.

The probative value of any statement of the kind must be measured by the intelligence of the person signing it, and the accuracy of the recitals it carries with established facts. These tests can do little to give value to that in question. The intelligence of the respondent is of a very low order. He was committed to the Bangor State Hospital for observation on November 27, 1948, and discharged therefrom after the term of court at which he was tried convened. The medical testimony, from the doctor who was the acting superintendent of the hospital during the respondent's stay there, places his intelligence quotient at forty-four and his mental age at six years and eight months. He was thirty-nine years old. Under these circumstances it is difficult to determine what implication was carried, or intended to be carried, by the statement of the officer with reference to the regaining of his "posture." The word may have no bearing upon the issue, as would be the case if it was used,

in accordance with its usual and ordinary meaning, to indicate nothing more than that he stood, or sat, up after a period of semi-consciousness. If it was intended, however, to indicate that he had regained his composure, questions inevitably arise as to the effect the questioning he had undergone on the basis of an assumed guilt would have had on a person of his mental age; the reaction of such a person when relieved of the pressure of such questioning by admitting what he had persistently denied; and whether such reaction would vary if his admission was true on the one hand or false on the other. The record is not helpful in determining any of these questions, but it does throw a considerable light on the issue whether the admissions were true or false.

The recitals of the statement carry admissions of motive and intent to kill, opportunity, and the grasping of it. It might be questioned whether the motive declared was a sufficient one to induce an intent to kill, even with a person of respondent's mental age. The statements of the respondent are that the two men who joined the party in the restaurant were with his "girl" when he came back to the booth in which he and others had been sitting with her; that he "did not like this"; that the girl invited them to the house; and that when the party reached there he "was still burned up to think these other men were bothering my girl." There is evidence that the respondent said something to one of them, or both, after they reached the house, to the effect that they should not pay attention to her, but there is no suggestion that either did so, or attempted to do so thereafter.

The answer as to the sufficiency of the declared motive may be that for one of the mental age of the respondent nothing more than a trivial one is essential to induce an intent to kill. It must be assumed, perhaps, that the jury weighed the evidence in the light of the particular mentality and decided that factual question with full recognition that

proof beyond a reasonable doubt was requisite. It may even be said that the inconsistency of his statements that he intended to kill two persons; was attempting to do so by putting poison in the glasses (plural) ; and that the girl got "the glass" (singular) in which he placed it casts no such doubt. His own statement as to an intent to kill, assuming the written statement to be his, is more than adequate to cover that issue.

It is when we pass to opportunity, as distinguished from motive and intent, that the evidence demonstrates the death could not have occurred in the manner the statement recites. His recital that he knew "there was some lye in the cupboard" could not be true if it was not there. The brother who testified for the state, and the father and mother of Yvonne testified that it was on the shelf above the kitchen sink. All three stated that it had been kept, at some earlier time, in one of the cupboards. The brother identified it as that under the sink. All said that the mother of Yvonne had moved it to the shelf some days before the respondent, who was visiting at the house, arrived to begin his stay there. He could not have known it was ever kept in a cupboard. Neither could he have taken it from the shelf where it was placed according to all the evidence on the point. There is nothing in the record to show that he was ever in a position close enough to the sink so that he could have reached it there at any time during the evening. The size of the room, its furniture and equipment have been noted. With nine people, or such lesser number as may have been within its small space parts of the time, it is difficult to believe that the respondent could have been near the sink at any time, if no member of the party could testify affirmatively to that effect. None did.

The respondent was the only member of the party who was out of the house a considerable part of the time in the approximate hour which passed between the arrival at the house and the death of Yvonne. During that time the

father of Yvonne poured beer into glasses he took from one of the cupboards and Yvonne passed them. Later he, or she, poured more, and she again passed the glasses. The aunt and her friend, possibly with help from Yvonne and her mother, prepared the chicken stew and started to cook it. It was not finished at the time of death. The aunt and her friend, with the two men who had joined the party at the restaurant, spent some minutes of the time in the room to which the archway led. Generally speaking, all except the respondent were in the kitchen all the time, although Yvonne passed back and forth between the two rooms, dancing and singing, to some extent. Yvonne's mother spent the major portion of the time in the rocking chair.

None of the members of the party except the brother of Yvonne, fourteen years old, and one of the men the respondent intended to kill, according to his statement, who had devoted himself to the friend of the aunt with considerable diligence, testified for the state. The aunt and the father and mother of Yvonne testified for the respondent. If it be assumed that the jury decided as a question of fact that the recital of the statement is true and the testimony of Yvonne's brother, father and mother on the point untrue or incorrect, it is even more apparent that the testimony as a whole does not establish the guilt of the respondent beyond a reasonable doubt. The only cupboard in which the lye had ever been kept was in that under the sink. It would have been virtually impossible for the respondent to have opened the door and take anything out of that cupboard without being observed.

A particular inconsistency of the statement should, perhaps, be noted. After declaring his decision to put lye in the "glasses," the respondent declares therein:

"Then I saw Yvonne take the glass * * *. She took one drink then *sat* it down * * *. Then she began to sing and dance * * *. Then she drank some more * * *. Next thing I knew she went into a spell * * *."

Thereafter it recites:

> When I put the lye in the glass, there was a little beer in the glass *. Then Vital poured more beer in the glass * * *. Then Yvonne got this glass * * *."

These statements cannot both be true. Neither can be any more true than the recital that he knew there was lye where there was not. It seems apparent that the statements made by the respondent and reduced to writing by the officers do not present the true facts, or his recollection of them, but recount them in accordance with the consolidated effect of what all the other persons present at the death had told the officers. Their normal course would be to urge admissions from him consistent with the facts as disclosed to them by statements made by the witnesses examined earlier, insofar as they believed them to be true.

All of the foregoing is without reference to an additional ground for reasonable doubt about the guilt of the respondent. That lies in a very considerable bulk of evidence about Yvonne's intention for self-destruction on the very date of her death. It cannot be doubted on the record that some minutes before her death she procured a butcher knife and not only attempted to end her own life with it, and proclaimed the intention to die that night when it was taken from her, but asserted, when her aunt remonstrated with her, that she had brought the aunt with her to see her die. There was additional evidence, the credibility of which may have been lessened by cross-examination and somewhat indirect rebuttal testimony, that she had told two different persons at earlier times that she was going to die on the anniversary of her husband's death, which was the day her death actually occurred if on the right side of midnight. The exact time is not entirely clear.

The complete lack of evidence that Yvonne complained that someone had put something in her beer argues strongly for the theory of self-destruction. It is difficult to under-

stand, otherwise, how she could have drunk beer so thoroughly charged with lye as hers must have been and said nothing. There is evidence that some minutes before her death, when she was sitting on the knee of the respondent, she complained that her "stomach was burning," but she made no complaint that anyone had put anything in her beer. All the evidence indicates that the poison should have been apparent from the taste and must have caused intense anguish almost at the moment it was consumed.

The verdict would be inexplicable on the suicide issue, without reference to any other, if an apparent explanation of it was not available in the instructions given the jury to guide its deliberations. Those instructions disclose errors so highly prejudicial to the rights of the respondent as to cause, or contribute to, a result which, under such circumstances, must be considered unjust and require that a new trial be ordered on the general motion, notwithstanding the fact that no exceptions were taken to the charge. *Cox* v. *Metropolitan Life Insurance Co.*, 139 Me. 167, 28 A. (2nd) 143, and cases cited therein. One error relates to an instruction with reference to the burden of proof. After stating definitely that the burden was upon the respondent to satisfy the jury by a fair preponderance of the evidence of the truth of the defenses of suicide and lack of his own mental capacity, the court continued:

> "It is not incumbent upon the State to prove to you beyond a reasonable doubt that Yvonne Pelletier Poitras did not take her own life * * *."

A second involves the presumption with reference thereto, where it was said that:

> "the presumption of the law is against self-murder, and stands unless and until prima facie evidence is adduced by the opposite party * * *. Love of life is presumed. Men naturally heed the instinct of self-preservation. In human experience, it is the common desire * * to preserve life, rather than to destroy it, and hence the law, where a person is

found dead, imputes to the circumstances the prima facie significance that death was caused by accident rather than suicide, and that presumption persists in its legal force to negative the fact of suicide until overcome by evidence."

There were carefully worded statements in the charge emphasizing that the respondent was clothed with a presumption of innocence and that proof of his guilt must be established beyond a reasonable doubt to justify a verdict of guilty, but they cannot be considered adequate to offset the prejudicial force and effect of the quoted excerpts.

The true rule on burden of proof, where possibilities of accident, suicide and crime are involved, is well stated in Wharton's Criminal Evidence, Vol. 2, Sec. 872, as follows:

"To sustain a conviction, proof of the criminal agency is as indispensable as the proof of death. The fact of death is not sufficient; it must affirmatively appear that the death was not accidental, that it was not due to natural causes, and that it was not due to the act of the deceased. Where it is shown by the evidence, on one side, that death may have been accidental, or it may have been the result of natural causes or due to suicide, and on the other side, that it was through criminal agency, a conviction cannot be sustained. Proof of death cannot rest in the disjunctive. It must affirmatively appear that death resulted from criminal agency."

With reference to the presumption against self-destruction, the proper rule is that declared by the New York Court in *People* v. *Creasy*, 236 N. Y. 205, 140 N. E. 563, as follows:

"The defendant was presumed not to have killed * * until it had been proven beyond a reasonable doubt. It is true there is a presumption that one does not take his own life. * * * Certainly the presumption as to the living is greater than as to the dead, and every presumption is to be indulged in as to the former as against the latter. The dead need no presumption; the facts as to them are

fixed, upon which time has placed an unchangeable and immutable end; the living do."

The verdict demonstrates that the jury had some doubt about the respondent's guilt. He was not found guilty of murder, although the instruction was as clear as it was proper that if his intention to kill one, or both, of the two men was established, sufficiently, and the instrumentality he attempted to apply to the purpose did in fact kill the decedent, he was guilty of murder. That principle is too well established to require the citation of authority. The verdict that the respondent was guilty of killing the decedent but not under circumstances that would make the act murder must have been influenced by the erroneous instructions with reference to the burden of proof and the force of the presumption against suicide. The mandate must be:

*Appeal sustained.*

*Motion granted.*

*Verdict set aside.*

*New trial ordered.*