STATE of Maine

v.

Edward J. SHANAHAN.

Supreme Judicial Court of Maine.

Aug. 9, 1979.

Michael D. Seitzinger (orally), Charles K. Leadbetter, Janet T. Mills, Asst. Attys. Gen., Augusta, for plaintiff.

Grover G. Alexander (orally), Gray, Lloyd P. LaFountain, Biddeford, for defendant.

Before McKUSICK, C. J., and POMEROY, ARCHIBALD, GODFREY and NICHOLS, JJ.

WERNICK, Justice.

Defendant Edward J. Shanahan was indicted, under 17–A M.R.S.A. § 201(1)(A),[1] for the murder of his wife, Teresa Shanahan. Tried before a jury in the Superior Court (Cumberland County) defendant was found guilty of manslaughter, 17–A M.R.S.A. § 203(1)(A).[2] Defendant has appealed from the judgment of conviction, asserting many claims of reversible error. We have considered all of defendant's points, and, denying the appeal, we deem it of benefit to give extended discussion to three of the issues raised: (1) whether certain extra-judicial inculpatory statements made by defendant were erroneously admitted in evidence because they had been received in violation of his *Miranda* rights; (2) whether these statements were wrongly admitted in evidence because, independently of them, the *corpus delicti* of the crime charged was not adequately shown; and (3) whether the jury's verdict was supportable on all the evidence.

The prosecution's theory at trial was that defendant had "intentionally or knowingly" killed his wife by shooting her, with the muzzle of a pistol placed against her head. The verdict finding defendant guilty of manslaughter, instead of murder, signifies that the jury concluded defendant had killed his wife "recklessly" or "with criminal negligence", rather than "intentionally" or "knowingly."

The evidence showed these circumstances. At 10:30 a. m. on March 2, 1978 defendant drove his peach colored Ford Mustang on Quaker Ridge Road in South Casco, Maine, proceeding in the direction away from Raymond towards Lewiston. Suddenly making a u-turn in the middle of the road, he reversed direction and drove towards his home.[3]

Having returned to his home, defendant heard the telephone ringing. His brother Frank Shanahan was calling from New York City. Defendant spoke with his brother. He told him, repeatedly, that his wife had been badly hurt, but he made no response to his brother's questions asking how she had sustained injury. At one point in the conversation defendant said that he thought his wife was dead. When his brother asked him whether he had called a doctor, defendant replied that he had not. Defendant's brother told defendant that he was going to call the Maine State Police, and defendant encouraged him to do so. Frank Shanahan thereupon called the Maine State Police Barracks in Scarborough, Maine, and informed them of what he had learned on the telephone. While his brother was calling the State Police, defendant made a telephone call to Dr. John Painter at his office in Raymond, Maine. He asked Dr. Painter to come to his house at once, saying his wife had been shot but giving no explanation of what had happened. Dr. Painter agreed to come right away.

State Police Trooper Wayne Denbow was directed by a radio message to go to defendant's home in Raymond. He arrived at 10:52 a. m. He saw no one outside the house, and following his radio instructions,

---

1. Section 201(1)(A) provides:

    "*1.* A person is guilty of murder if:

    "*A.* He intentionally or knowingly causes the death of another human being; . . ."

2. Section 203(1)(A) provides:

    "*1.* A person is guilty of manslaughter if he:

    "*A.* Recklessly, or with criminal negligence, causes the death of another human being; or . . ."

3. Testifying in his own behalf, defendant gave the explanation that he had left his home to go for a doctor in Raymond. Being very confused, he had been driving in the wrong direction, and when he realized it, he made the u-turn to go in the opposite direction, back to Raymond.

he waited until more police arrived. Meanwhile, at 10:55 a. m. State Police Lieutenant LaMontagne telephoned the Shanahan residence. Defendant answered, and after a brief conversation with him, which he taped, Lieutenant LaMontagne instructed defendant to go outside and to wait for the police to arrive.

In the meantime, Corporal Gabrielski, Corporal Savage and Sergeant Smith had arrived on the scene to reinforce Officer Denbow, and with him they stayed outside the house. Very soon thereafter, defendant emerged from the house. He had his hands in the air and said: "Don't shoot! Don't shoot!" Sergeant Smith immediately placed defendant under arrest. Denbow, Gabrielski and Savage went into the house. The body of Teresa Shanahan was found on the floor in an upstairs bedroom. A pistol was on the bed. Blood stains were seen on the walls of the bedroom, and in an adjoining bathroom blood stains were found on the washbasin and on a washcloth and towelling. Subsequent medical examination revealed that Mrs. Shanahan was dead when her body had been discovered. She had been killed by a bullet which had entered at her right temple, passed through her brain and emerged through the left temple area, near the bottom of the ear.

After he was arrested, defendant was placed in a police cruiser vehicle. State Police Officer James Pinette, who arrived at the Shanahan residence at 11:17 a. m., informed defendant of his *Miranda* rights and asked him whether he understood them. Defendant gave an affirmative reply. Pinette then asked whether defendant wished to waive his rights and make a statement. Without responding to the question, defendant began talking about the events of that morning. He said first, referring to his wife, "I want her back." Defendant then discussed the shooting incident at some length with Pinette. (At trial, defendant testified that he had no recollection of his conversation with Pinette, and that he did not know what, if anything, he said to the officer.)

After he had finished talking with Pinette, defendant was taken in an automobile by Officer Martin Greeley and Sergeant Bradford Smith to the detention facility at the Cumberland County Sheriff's Office in Portland, Maine. During the ride to Portland, defendant was given a second set of *Miranda* warnings by Officer Greeley. He agreed to waive his *Miranda* rights and had a conversation with Officer Greeley concerning the death of his wife.

At the Sheriff's Office defendant was booked by Deputy Sheriff James Langello, who testified that defendant took "a great deal of time" answering "common questions" relating to his name, date of birth, etc. Defendant was then interviewed by Dr. Roger Zimmerman, a clinical psychologist who worked as Director of Health Services at the Sheriff's Department.

Dr. Zimmerman formed the opinion that defendant was suffering from an "agitated depression of psychotic proportion" and that he might attempt to commit suicide. He asked Dr. Stephen Soreff of the Maine Medical Center to examine Shanahan and render a second opinion. Dr. Soreff agreed. At 4:00 p. m. that afternoon Dr. Soreff examined Shanahan in the emergency room of the Maine Medical Center and concluded that Shanahan was suffering from both psychotic depression and organic brain syndrome partially caused by alcohol consumption. Dr. Soreff believed that for Shanahan's own safety he should be committed to the Augusta Mental Health Institute for observation and treatment.

At some point later in the evening of March 2, 1978, defendant was transported to the Augusta Mental Health Institute where he was examined by Dr. Ulrich Jacobsohn, the clinical director of the Institute. Dr. Jacobsohn concluded that defendant was not suffering from any psychosis, and he was released from the Institute that evening.

### 1. The Claimed Miranda Violations.

On June 27, 1978 counsel for defendant filed two motions to suppress extra-judicial inculpatory statements he had made as evi-

dence against him. One motion was directed to defendant's telephone conversation with Lt. LaMontagne and the other to his conversation with Officer Pinette.

■ As to his inculpatory statements to LaMontagne, defendant maintained that he gave them without the benefit of the *Miranda* warnings of his constitutional rights.[4] With respect to his conversation with Officer Pinette, defendant maintained that while he had been advised of his *Miranda* rights before he made any statements, he had not in fact purported to waive them and, in any event, his mental condition at the time was such that he could not make an effective waiver of them.

On June 29, 1978, the two motions for suppression were consolidated for hearing with a pre-trial motion that defendant be admitted to bail, and a Justice of the Superior Court heard all three motions together. The State presented testimony by the State's Medical Examiner, Dr. Henry Ryan, and various police officers. At the close of the State's evidence, without hearing testimony from the witnesses defendant wanted to call, the Justice stated that he would deny the two suppression motions. Over defense counsel's objection that the Justice should not rule until defendant had presented his evidence, the Justice terminated the hearing.

On July 21, 1978 counsel for defendant filed a motion to reconsider the denial of defendant's motions to suppress. This motion was denied a week later, without a hearing. Subsequently, on September 5, 1978, the Justice reversed himself and held a hearing on the motion to reconsider. He decided to set aside his previous orders denying the suppression motions, and he set a date for further hearing on these motions.

On October 12, 1978, the Justice undertook the further hearing on the two suppression motions. He said that hearing would be resumed with defendant having opportunity to present such evidence as he wished. The Justice made plain that he would not permit the re-examination of witnesses who had previously been examined at the June 29, 1978 suppression hearing. Believing this ruling unfair, defendant personally addressed the presiding Justice and demanded that the hearing on the suppression motions should start entirely anew, as if the June 29th hearing had never been held. The Justice overruled this personal demand of defendant. Thereupon, and acting contrary to the advice of his attorney that he should go forward with the hearing, defendant made his own personal determination to withdraw both of his motions to suppress. Stating that he could not prevent defendant from withdrawing his motions, the presiding Justice authorized defendant to withdraw them, observing on the record that he believed that defendant was seeking to "judgeshop."

Having withdrawn his suppression motions on October 12, 1978, defendant one week later sought to present them to another Superior Court Justice. This Justice ruled that by his prior conduct defendant had "waived" his right to be heard on his suppression motions. The Justice stated that defendant had made "a calculated decision not to proceed with a hearing before a particular Judge" and that defendant was now seeking "to have those same matters

---

**4.** As the discussion which follows shows, we decide that defendant ultimately acted in a manner which caused him to lose his right to assert alleged *Miranda* violations. We should note, however, that *Miranda* was inapplicable to defendant's conversation with Lt. LaMontagne. *Miranda* warnings are required only where the defendant is subjected to "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 445, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Beckwith v. United States*, 425 U.S. 341, 345, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). At the time of the telephone conversation with LaMontagne defendant was in his own house and not

under custodial control by the police. Although Officer Denbow may have arrived at the house and parked his car in the driveway when defendant was conversing with LaMontagne, no police officer was in close proximity to the defendant. The circumstances thus fall far short of indicating that defendant's freedom of action was limited by police officers in any way. The situation, here, is quite unlike that in *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), for example, where four police officers surprised and surrounded the defendant in his own bedroom at 4:00 o'clock in the morning.

heard before another Judge . . . that is playing fast and loose with the judicial process. I do not intend to permit it." This second Justice presided at defendant's jury trial. When defendant objected at trial to the admissibility in evidence of his extra-judicial inculpatory statements on the grounds that they were received by the police in violation of *Miranda*, the presiding Justice overruled the objections, stating that defendant had "waived" his right to make such claims and was, therefore, permanently foreclosed from having them judicially considered.

The proceedings described above yield no reason for a reversal of the judgment of conviction. Although defendant's motions to suppress spoke generally of a violation of defendant's "constitutional rights" without referring particularly to *Miranda* violations, the record of the June 29th hearing makes plain that defendant was relying only on such constitutional rights as are guaranteed him under *Miranda v. Arizona, supra*. Defendant's contention was that his disturbed mental condition on March 2, 1978 prevented him from fully understanding the nature of his rights under *Miranda* and, consequently, that he had not purported to make, and was incapable of making, a knowing and intelligent waiver of his *Miranda*

rights. It is evident, then, that defendant never contended that his inculpatory statements were "involuntary", so as to have been independently violative of 14th Amendment "due process of law", in the sense that the police had elicited the statements by force, fraud or coercion or had exploited defendant's disturbed mental condition so as to overbear his will. We are therefore called upon, here, to evaluate *only* contentions that the prophylactic interests of *Miranda* were not served; we have no concern with the more seriously substantive interests underlying the independent "voluntariness" required by 14th Amendment "due process of law" as a precondition of the admissibility in evidence of extra-judicial admissions, or confessions, of a defendant.[5]

Defendant initially raised his *Miranda* claims at a seasonable time prior to trial.[6] Unquestionably, the first hearing on June 29th did not afford defendant a fair opportunity to present these claims, inasmuch as the presiding Justice refused to allow the defendant to present his own evidence in support of his motions to suppress. However, the Justice who presided, later realizing that he may have erred, set aside his denial of the suppression motions and af-

**5.** Recently, the Supreme Court of the United States contrasted the prophylactic nature of *Miranda* rights, as infusing the "voluntariness" by which such rights may be effectively waived, with the more strongly substantive concerns embodied in the independent concept of "voluntariness" mandated by 14th Amendment "due process of law." In *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290, 303 (1978) the Court said:

"Statements made by a defendant in circumstances violating the strictures of *Miranda v. Arizona*, . . . are admissible for impeachment if their 'trustworthiness . . . satisfies legal standards.' *Harris v. New York*, . . . .. But any criminal trial use against a defendant of his *involuntary* statement is a *denial of due process of law*, 'even though there is ample evidence aside from the confession to support the conviction.' *Jackson v. Denno*, . . . [378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964)] at 376, 84 S.Ct. 1774 . . . ." (emphasis added)

See also *Michigan v. Tucker*, 417 U.S. 433, 446-448, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974).

**6.** In *State v. Bishop*, Me., 392 A.2d 20 (1978) we decided that where a defendant fails to make a seasonable pre-trial motion to suppress evidence allegedly obtained in violation of the rights guaranteed by the 4th–14th Amendments to the Constitution of the United States, he will be barred, absent special circumstances, from raising those same issues at trial. We have not yet decided, however, whether motions to suppress evidence obtained in violation of a defendant's rights under the 5th–14th Amendments must likewise be made prior to trial. *See also State v. Hazelton*, Me., 330 A.2d 919 (1975). We have no occasion to decide the issue, here, where defendant did file his motions to suppress seasonably before trial. Thus, we now intimate no opinion on the issue of whether or not a defendant will lose the right to object at trial to the admissibility in evidence of proffered extra-judicial admissions of defendant, claimed to have been received in violation of rights guaranteed under the 5th–14th Amendments to the Constitution of the United States, if defendant has not moved to suppress such evidence seasonably before trial.

forded defendant fair opportunity, still seasonably prior to trial, to complete the hearing as to his *Miranda* claims. Defendant made a deliberate tactical choice not to avail himself of this opportunity. He decided to withdraw his motions to suppress as they were then pending before one Superior Court Justice, this move being the first step in attempting to bring them forward later to be considered by another Justice.

■ A defendant's right to a judicial hearing of claims that his constitutional rights have been violated does not include a right to have the determination made by a Justice of defendant's own choosing, or preference. Thus, when on October 12th the Justice of the Superior Court before whom defendant's motions to suppress had been pending, and who had already undertaken to hear them, concluded that further hearing should be held, defendant had no right to withdraw his suppression motions as a maneuver to circumvent such further hearing and to seek to present the motions for the consideration of another Justice. If defendant believed that the first Justice had proceeded erroneously, or unfairly, his proper course was to make appropriate objections to preserve his claims on the record and then seek appropriate remedies for the alleged errors by appeal. Defendant had no right to take matters into his own hands to provide a remedy that he thought would work better, by resorting to the tactic of withdrawing his motions to suppress as his first step to undertake "judgeshopping." We decide that this conduct by defendant constituted a deliberate by-pass of sound procedural requirements, in consequence of which defendant must be taken to have lost his right to a judicial determination of his claims of *Miranda* violations as a ground for the exclusion from evidence of his extra-judicial inculpatory statements.

■ We stress that in so deciding, we are not purporting to settle the issue whether or not a defendant *must* raise claims of *Miranda* violations at a seasonable time prior to trial upon peril that the failure so to assert such claims will constitute a procedural default depriving defendant of the right to assert the claims during trial. See n. 6, *supra*. We now hold only that when a defendant (1) *chooses* to raise *Miranda* issues seasonably before trial and (2) then proceeds to withdraw them from judicial consideration for the patently invalid reason of avoiding having them decided by the Justice before whom they are pending and seeking to have them decided by a different Justice more to defendant's liking, it is not an abuse of discretion for a second Justice before whom defendant tries to reassert the claims, whether pre-trial or at trial, to rule that the defendant was guilty of a deliberate by-passing of procedural requirements and thus lost his right to a judicial determination of his claims of *Miranda* violations.[7]

### 2. The Corpus Delicti Issue.

Defendant contends that his admissions should not have been admitted in evidence at trial because the prosecution failed to satisfy the requirements of the *corpus delicti* rule which, as applied to a charge of murder, requires that the prosecution present

"(1) evidence creating a substantial belief that the identity of the deceased is the person named in the indictment as the victim; [and] (2) evidence creating a substantial belief that the crime charged had been committed by someone." *State v. Davis*, Me., 374 A.2d 322, 324 (1977).

It is not open to dispute, here, that the State satisfied the first element of the *corpus delicti* rule by proving that Teresa Shanahan was the person found dead in defendant's home on March 2, 1978. To satisfy the second element, the State was obligated to present evidence which created

7. We stress, too, that this decision concerns only *Miranda* claims, as distinguished from claims that defendant's admissions, or confession, had been "involuntary" so as to be independently in violation of the "due process of law" guaranty of the 14th Amendment. As to this latter ground for suppression of evidence, we have no present occasion to decide whether the right to assert it at trial can be lost by virtue of a prior by-passing of procedural requirements.

a substantial belief that Teresa Shanahan's death was not a suicide, and that it was not purely accidental and devoid of any criminal agency. In *Davis, supra*, this Court noted that a number of evidentiary factors established that a criminal agency had been at work: (1) the autopsy established that the deceased died from a blow on the back of the head; (2) the victim's body had been stabbed repeatedly; (3) the body had been transported after death had occurred; and (4) the victim's car had been stolen. Since these factors plainly negatived any possibility of suicide or accident, we held in *Davis* that the State had satisfied the second element of the *corpus delicti* rule and that defendant's admissions were properly admitted in evidence based upon this foundation.

Contrasting with *Davis* is *State v. Peterson*, 145 Me. 279, 75 A.2d 368 (1950), where this Court reversed a manslaughter conviction because the State had not effectively negated the possibility that the deceased could have died as a result of an accident, or that she could have committed suicide and that, therefore, the *corpus delicti* not having been sufficiently shown, the admission in evidence of defendant's inculpatory statements was prejudicial error. In *Peterson* this Court quoted approvingly from Wharton's Criminal Evidence, Vol. II, § 872 (1935):

"To sustain a conviction, proof of the criminal agency is indispensable as the proof of death. The fact of death is not sufficient; *it must affirmatively appear that the death was not accidental*, that it was not due to natural causes, *and that it was not due to the act of the deceased*. Where it is shown by evidence, on one side, that death may have been accidental, or it may have been the result of natural causes or due to suicide, and on the other side, that it was through criminal agency, a conviction cannot be sustained. Proof of death cannot rest in the disjunctive. It must affirmatively appear that the death resulted from criminal agency." (emphasis added) Id. at 289, 75 A.2d at 374.

Bearing in mind these legal principles, we turn to the evidence which the State had presented at the time of defendant's *corpus delicti* objection to the admission of his inculpatory statements. By then, the State had adduced evidence indicating that (1) the gunshot wound which killed Teresa Shanahan was a contact wound, i. e., one caused by the placing of the muzzle of the firearm directly against the victim's head; and (2) bloodstains were found around the washbasin and on a washcloth and towelling in the bathroom adjacent to the bedroom where the deceased was found.

Although Dr. Henry Ryan, the State Medical Examiner, conceded in his testimony that the location of the wound, as a contact wound, was consistent with either suicide or intentional murder, he further testified that despite a possibility that Mrs. Shanahan could be ambulatory for approximately fifteen minutes after having been wounded as she was, his opinion was that it was doubtful that "she moved about to any extent at all."

This evidence and the additional evidence of the presence of bloodstains in the bathroom around the washbasin and on a washcloth and towelling was a sufficient showing of the *corpus delicti* to make admissible in evidence the statements of defendant implicating him as the perpetrator of the unlawful homicide at issue. As we said in *State v. Ames*, Me., 388 A.2d 94, 96 (1978), the standard for this purpose is whether the evidence is adequate to provide " 'probable cause' to believe that the crime charged has been committed by some person." Here, the evidence amply gave probable cause to believe that a person other than the victim went to the bathroom to wash away bloodstains from his, or her, person. Such effort to conceal, by removing, the existence of bloodstains on the person, in immediate conjunction with the fact that another person was in an adjacent room shot through the head, the wound being a contact wound, is enough to generate probable cause to believe that this other person who had undertaken to wash away blood was thereby indicating guilt of hav-

ing shot the victim in a manner such that the killing was an intentional, knowing, murder.[8]

The admission in evidence of defendant's inculpatory statements did not violate the rule requiring a "probable cause" showing of the *corpus delicti* as a prerequisite of the admissibility of such evidence.[9]

### 3. Sufficiency of the Evidence.

■ Defendant contends that the evidence was insufficient to support a conviction of manslaughter, pursuant to 17–A M.R.S.A. § 203(1)(A). We have reviewed the evidence in the trial record, and we conclude that defendant's own trial testimony, standing alone, would provide adequate support for the conviction. In addition, the testimony of Officers Pinette and Greeley, concerning defendant's admissions made to them, also provide support for the jury's verdict. The testimony of Pinette, Greeley and the defendant varied in some respects, but all agreed that the killing was unintentional, and that the defendant had not intended to fire the gun at his wife. Officer Pinette testified concerning his conversation with defendant on the morning of defendant's arrest:

"Mr. Shanahan stated that he took a 38-caliber revolver, a 38-caliber handgun which he knew was loaded, from the night stand on the right side of the bed and raised it and as he did, and I [Pinette] made the motions, put my hand, and going down and picking up the handgun as he continued, *he said he pulled the trigger* hitting his wife. I made the motion like going in the night stand like so, and he answered that was correct.

"[H]e stated *he had not intended to shoot her, the shooting had been accidental, he had taken out the gun to impress her. He stated he had on different occasions pointed the gun at himself to scare her* and to draw sympathy to himself." (emphasis added)

Officer Greeley testified as to what defendant told him, and gave a slightly different version of the events which led to Teresa Shanahan's death:

"He stated that he was in the bedroom, he was taking his 38 revolver from the night stand which was beside the bed, and as he was lifting the revolver out of the drawer to this night stand, *it went off* and struck his wife who was on the other side of the bed. He stated it was an accident." (emphasis added)

Finally, defendant took the stand at trial and offered his own explanation of what had transpired:

"[S]he [Teresa Shanahan] was sitting by the end table on her side, just finished getting dressed, and I had the revolver and I came back to the edge of the bed facing the bed on the left-hand side, at the very edge, and *I raised the gun towards my head, cocking the trigger,* and thinking that if I was going to die or commit suicide, I wanted to do it near her, and that's why I did it that way. She either heard the gun cocking or saw me in the process of raising it to my head, and she jumped up and she said something like, 'No Eddie, don't Eddie.' And *she grabbed my hand and she pulled the gun down away from my head and, pointed it towards her,* then there was an explosion and then I don't—for a while I don't know." (emphasis added)

■ A conviction for manslaughter is plainly supportable by proof that the defendant (1) consciously disregarded a risk; (2) defendant's conduct constituted a gross deviation from the conduct of a reasonable man; and (3) defendant's conduct caused the death of the deceased. Defendant's own testimony by itself was enough to support the jury's finding of the elements of reckless manslaughter. Defendant admitted that he knew the pistol was loaded, that he cocked the trigger and raised it to his head in a deliberate effort to obtain his wife's attention and sympathy. The jury

---

**8.** See Shakespeare, *Macbeth*, Act II, Scene 2: "A little water clears us of the deed." (Lady Macbeth to Macbeth).

**9.** *See State v. Davis, supra*, n.2 at 324.

could infer that he was prompting her to intervene in order to thwart what must have appeared to her to be a suicide attempt on the part of her husband. The jury could also infer that the defendant was aware of the possibility that she might attempt to wrest the gun away from him, and that in the course of a struggle for the gun there was a serious danger that the gun might accidentally discharge causing serious injury or death to one of them. The jury was entitled to conclude that defendant's conscious disregard of this risk constituted a gross deviation from the conduct of a reasonably prudent man. Lastly, under the "causation" provisions of 17–A M.R.S.A. § 56,[10] Teresa Shanahan's conduct in attempting to wrest the gun away from her husband cannot be held to be, as a matter of law, an intervening cause relieving defendant of criminal responsibility for her death.

The jury had an adequate evidentiary basis for deciding beyond a reasonable doubt that defendant was guilty of the crime of reckless manslaughter.

The entry is:

Appeal denied.

Judgment of conviction affirmed.

DELAHANTY, J., did not sit.

---

10. The statute reads:

"Unless otherwise provided, when causing a result is an element of a crime, causation may be found where the result would not have occurred but for the conduct of the defendant operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the defendant was clearly insufficient."