2011 ME 100

**STATE of Maine**

v.

**Luis PABON.**

Supreme Judicial Court of Maine.

Argued: Sept. 15, 2010.
Decided: Sept. 13, 2011.

**1148**

Benet Pols, Esq., Brown & Pols, P.A., Brunswick, for appellant Luis Pabon, on the briefs.

Stephanie Anderson, District Attorney, and Katherine Tierney, Asst. Dist. Atty., Portland, for appellee State of Maine, on the briefs.

Benet Pols, Esq., for appellant Luis Pabon, at oral argument.

Katherine Tierney, Asst. Dist. Atty., for appellee State of Maine, at oral argument.

Panel: SAUFLEY, C.J., and LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

Majority: SAUFLEY, C.J., and LEVY, GORMAN, and JABAR, JJ.

Dissent: SILVER, and MEAD, JJ.

LEVY, J.

[¶ 1]   Luis Pabon appeals from a judgment entered in the Superior Court (Cumberland County, *Warren, J.*) after a jury verdict convicting him of elevated aggravated assault (Class A), 17–A M.R.S. § 208–B(1)(A) (2010), and attempted murder (Class A), 17–A M.R.S. § 152(1)(A) (2010). He asserts that the court's failure to include the dwelling-place exception to the duty to retreat when instructing the jury on self-defense constitutes obvious error. We affirm the judgment.

## I.   FACTS AND PROCEDURE

[¶ 2]   Pabon was charged with elevated aggravated assault (Class A), 17–A M.R.S. § 208–B(1)(A), and attempted murder (Class A), 17–A M.R.S. § 152(1)(A), for stabbing Kelly Fusco, who was his girlfriend and housemate at the time, in the early morning hours of January 8, 2007.

[¶ 3]   The trial evidence establishes that on the night of January 7, 2007, Fusco, along with Pabon and their housemate, Theresa Bardsley, visited several bars in Portland.   At one point during the evening, Pabon left one of the bars without telling the two women.   Subsequently, the women went to a bar on Commercial Street, and found him there with Fusco's uncle.   Pabon and the uncle engaged in a dispute, and afterward, Pabon and Fusco argued;   Pabon then went to another bar across the street.

[¶ 4]   Fusco's uncle drove Fusco home. According to Pabon and other witnesses, prior to her departure, Fusco yelled anti-Hispanic slurs and expletives at Pabon outside of the first bar on Commercial Street.   Several witnesses also testified that she did the same while her uncle drove her up and down the street in his car.   Pabon called 911 and reported that Fusco was drunk and violating her probation.   He also told the operator that Fusco was screaming that she was going to stab him and kill him.   He said that Fusco was on Commercial Street at the first bar, and that she was "outside the bar screaming." The operator replied that the police would meet him at the bar across the street.

[¶ 5]   The police officer who arrived to meet Pabon had been advised of the alleged threat.   However, Pabon did not provide the officer any further information about the threat, but focused instead on the fact that Fusco was intoxicated and out late in violation of her probation.

[¶ 6] Bardsley, the housemate, spoke to Pabon after he had met with the police officer, and he told her that he was "going home to kill that fucking bitch." Bardsley then called Fusco at the apartment. After being told of Pabon's threat, Fusco asked Bardsley to pick her up. When Bardsley arrived at the apartment and saw police and ambulances, she left the scene without entering the apartment.

[¶ 7] Pabon traveled to the apartment by cab. The cab driver testified that Fusco came out onto the porch and yelled at Pabon, at which point Pabon entered the apartment and then returned to the cab and called 911. This second 911 call was made approximately an hour after the first 911 call, and Pabon spoke with the same operator, telling her that he needed police assistance because he had "a lady over here all pissed off" who was screaming. He also told the operator, again, that Fusco was in violation of her probation because she was drunk. The operator replied that she had looked up Fusco's probation and its terms did not require her to abstain from alcohol. She then asked Pabon whether Fusco was threatening him. Pabon replied simply that Fusco was screaming in the apartment. The operator told him she would send the police.

[¶ 8] Pabon testified that he remembered that after he entered the apartment, Fusco screamed, "Fuck you," two or three times, and then he fell forward "reaching," but that he could not remember anything between then and when he was standing in the driveway telling the police, "Better get some help, I stabbed her."

[¶ 9] Fusco testified that she woke up in the apartment after 1:00 a.m. to the sound of Pabon tapping on the window and that she opened the door when Pabon told her he was done with their dispute. They began arguing in the kitchen and, when Pabon said something derogatory about her children, Fusco pushed a vase off a table and started to walk away. As Fusco attempted to leave the kitchen, Pabon went to the dishes, grabbed a knife, and began stabbing Fusco in her torso and on her arms and hands as she tried to defend herself. Fusco testified that after the blade of the knife broke off inside her, Pabon retrieved another knife, and started stabbing her again, this time in her throat and face. Fusco became so weak that she could not stand on her own. Pabon held her up with one hand and continued stabbing her with the other. After Fusco fell to the ground, Pabon cut Fusco's throat. She then dragged herself from the kitchen to the bedroom to, in her words, "die."

[¶ 10] When a police officer arrived at the apartment building three to four minutes after Pabon's second 911 call, Pabon emerged from the building almost immediately and, without responding to the officer's question as to whether he had called, he walked down the stairs of the building with his hands in his pockets. The officer asked that he remove his hands from his pockets, which he did. Pabon then put his hands to his sides. He told the officer to get help because he had "stabbed her," and then turned around and put his hands on his head. After the officer asked Pabon again what was happening, Pabon repeated, "I stabbed her." The officer started placing Pabon's hands behind his back, and Pabon said for a third time, "I stabbed her," and advised the officer to get help. The officer noted that Pabon's hands and sleeves were covered in blood. He arrested Pabon. After Pabon had been arrested and placed inside a police cruiser, an audio recorder inside the cruiser recorded him stating that Fusco "had a knife in her hand—she was screaming to me—she had a knife in her hand and I got a knife too." When he testified at trial, Pabon could not recall having made that statement.

[¶ 11] The officer then entered the apartment and found a large pool of blood in the kitchen, along with blood smears and broken items, including a knife handle without a blade. He called for an ambulance, and then followed a trail of blood smears into a bedroom, where he found Fusco on the bed. She told him that Pabon had stabbed her. Fusco was taken to Maine Medical Center, where the doctors found ten to fifteen stab wounds on her body, including one that necessitated removal of her left lung. They also discovered three to four inches of a broken-off knife blade in Fusco's abdominal cavity.

[¶ 12] A psychologist called by the defense testified that Pabon's actions were typical of affective violence, which is characterized by high levels of emotional stimulus and emotions such as anger and fear resulting from perceived threats. The psychologist explained that the subsequent physical violence is typically overdone and accompanied by increased physical arousal such as blood pressure, heart rate, and respiration. He noted that people who witnessed domestic violence as children or who have been physically or emotionally abused are more likely to turn to violence as a means of resolving conflict. Pabon told the psychologist that he had witnessed extensive domestic violence between his parents and suffered both physical and emotional abuse throughout his childhood. The psychologist explained that when people experience high levels of affective violence, some will disassociate and fail to remember the event.

[¶ 13] Pabon's defense was built around his claim that he was so intoxicated that he could not have formed the requisite state of mind and, separately, that he had stabbed Fusco in self-defense, and that his repeated stabbing of her, as well as his inability to remember the stabbing, were a product of affective violence as described by his expert psychological witness.

[¶ 14] The court instructed the jury on self-defense based on 17–A M.R.S. § 108(2) (2010),[1] including the explanation that "a person is justified in using deadly force upon another person in order to de-

1. Title 17–A M.R.S. § 108(2) (2010) provides:

2. A person is justified in using deadly force upon another person:
   A. When the person reasonably believes it necessary and reasonably believes such other person is:
   (1) About to use unlawful, deadly force against the person or a 3rd person; or
   (2) Committing or about to commit a kidnapping, robbery or a violation of section 253, subsection 1, paragraph A, against the person or a 3rd person; or
   B. When the person reasonably believes:
   (1) That such other person has entered or is attempting to enter a dwelling place or has surreptitiously remained within a dwelling place without a license or privilege to do so; and
   (2) That deadly force is necessary to prevent the infliction of bodily injury by such other person upon the person or a 3rd person present in the dwelling place;

   C. However, a person is not justified in using deadly force as provided in paragraph A if:
   (1) With the intent to cause physical harm to another, the person provokes such other person to use unlawful deadly force against anyone;
   (2) The person knows that the person against whom the unlawful deadly force is directed intentionally and unlawfully provoked the use of such force; or
   (3) The person knows that the person or a 3rd person can, with complete safety:
   (a) Retreat from the encounter, except that the person or the 3rd person is not required to retreat if the person or the 3rd person is in the person's dwelling place and was not the initial aggressor;
   (b) Surrender property to a person asserting a colorable claim of right thereto; or
   (c) Comply with a demand that the person abstain from performing an act that the person is not obliged to perform.

fend himself when ... he reasonably believed that the other person is about to use deadly force on him and ... he reasonably believes that his use of deadly force is necessary to defend himself." The court also instructed the jury that "[a] person is never justified in using deadly force if he provokes the encounter leading to the use of deadly force or if he knows he can retreat from the encounter in complete safety."

[¶ 15] The court's self-defense instruction did not include the dwelling-place exception to the duty to retreat included in section 108(2)(C)(3)(a): "[T]he person ... is not required to retreat if the person ... is in the person's dwelling place and was not the initial aggressor." 17–A M.R.S. § 108(2)(C)(3)(a) (2010). Neither Pabon nor the State objected to the court's self-defense instruction or requested further instruction regarding the dwelling-place exception to the duty to retreat.

[¶ 16] The jury found Pabon guilty on both counts, and the court sentenced him to twenty-six years of imprisonment for each count, to be served concurrently, with all but twenty years suspended, and six years of probation.

## II. DISCUSSION

[¶ 17] Pabon contends that the trial court erred by failing to include the dwelling-place exception in its self-defense instruction. The State does not dispute that the omission of the dwelling-place exception was error, but contends that the error was harmless because there was no reasonable possibility that the verdict would

have differed if the instruction on the dwelling-place exception had been given.[2] Both assert that because Pabon did not object to the instructions at trial, we should evaluate the omission under the obvious error standard, but they differ as to the outcome we should reach. We begin by (A) reviewing the obvious error standard, and then (B) applying the standard to the circumstances of this appeal.

### A. Obvious Error Standard

[¶ 18] Where no party objects to an alleged error at trial, "[o]bvious errors or defects affecting substantial rights" may still be addressed on appeal. M.R.Crim. P. 52(b). We have characterized obvious error as "a seriously prejudicial error tending to produce manifest injustice." *State v. Perry*, 2006 ME 76, ¶ 15, 899 A.2d 806 (citations omitted). By its very nature, obvious error does not lend itself to a precise definition. In our earliest decision applying the obvious error standard to a faulty criminal jury instruction, *State v. Wright*, we adopted the civil standard for reviewing unpreserved errors: whether a "manifest error in law has occurred in the trial ... and injustice would otherwise inevitably result." 128 Me. 404, 406, 148 A. 141 (1929).

[¶ 19] Thus, the obvious error standard (1) calls for an evaluation of the error in the context of the entire trial record to determine (2) whether the error was so seriously prejudicial that it is likely that an injustice has occurred:

2. The State also contends that the judgment should be affirmed because there was no evidence Fusco used deadly force against Pabon and also, because the threatened use of deadly force is not itself deadly force, there was no evidence upon which the jury could conclude that it was reasonable for Pabon to believe that Fusco was about to use deadly force

against him. See 17–A M.R.S. § 108(2)(A)(1) (2010); see also State v. Glassman, 2001 ME 91, ¶¶ 8–9, 772 A.2d 863 (concluding that the threat of deadly force does not constitute deadly force). Because we conclude that there was no obvious error in the court's instructions, we need not and do not evaluate this separate contention.

The obvious error standard requires the reviewing court to make a penetrating inspection of all the circumstances of the trial to determine whether there exists a seriously prejudicial error tending to produce manifest injustice. What is obvious error defies precise articulation, and only the particular circumstances, weighed with careful judgment, will determine whether the obviousness of the error and the seriousness of the injustice done to the defendant thereby are so great the Law Court cannot in good conscience let the conviction stand.

*State v. Daley*, 440 A.2d 1053, 1055 (Me. 1982) (citations omitted) (quotation marks omitted).

[¶ 20] Although our opinions are largely in agreement that before an instructional error can be deemed obvious, the prejudice resulting from the error must be manifest, they have not been consistent in articulating the test to be employed in making that determination. For example, in *State v. Peterson*, we asked whether the "verdict would be inexplicable" but for instructions that "disclose errors so highly prejudicial to the rights of the respondent as to cause, or contribute to, [an unjust result]." 145 Me. 279, 288, 75 A.2d 368 (1950). A less demanding test was employed in *State v. Greenlaw*, which concluded that "in as much as [the erroneous instruction] may have misled the jury . . . we deem this manifest error in law an efficient cause for setting aside the verdicts below." 159 Me. 141, 150, 189 A.2d 370 (1963), *overruled on other grounds by State v. Gordon*, 321 A.2d 352, 359 (Me. 1974).

[¶ 21] Beginning with *State v. McKeough*, 300 A.2d 755, 761 (Me.1973), we have generally framed the obvious error test in terms of a reasonable possibility that, but for the trial court's error, the jury would have reached a different verdict. However, the *McKeough* opinion did not portray the "reasonable possibility" standard as a test for identifying obvious error. Rather, the absence of a "reasonable possibility" was the conclusion of the Court's analysis as to "whether the Justice's instruction contained seriously prejudicial errors tending to produce manifest injustice." [3] *Id.* at 757.

[¶ 22] Adopting the "reasonable possibility" language of *McKeough* as the standard, many of our subsequent decisions have reviewed for obvious error, both instructional and otherwise, by assessing whether there was a reasonable possibility that, absent the unpreserved error, the jury would have reached a different verdict. *See State v. Nelson*, 2010 ME 40,

---

**3.** That the "reasonable possibility" standard was not the test the Court employed in *McKeough* is evident in the opinion's description of the ultimate question to be addressed. Having initially concluded that the trial court erred by failing to properly instruct on the mens rea element of the crime of robbery, the remaining inquiry was framed in the following terms:

> The Justice's omission to instruct as to [the defendant's] intent to deprive [the owner of his property] permanently was error but our concern now is to determine whether *manifest* error exists. Did the Defendant suffer serious prejudice as a result of the omission?

*State v. McKeough*, 300 A.2d 755, 758 (Me. 1973). Based on a review of the record, the relevant case law, and the totality of the trial court's instructions, the opinion concluded that there was "no reasonable possibility that a complete instruction . . . would have resulted in a different verdict." *Id.* at 761. There is no indication in *McKeough* that the Court intended its conclusion to represent a new test for determining obvious error. Indeed, as explained above, the test the Court applied was whether "the Defendant suffer[ed] serious prejudice as a result of the [faulty jury instruction]." *Id.* at 758.

¶ 14, 994 A.2d 808; *Perry,* 2006 ME 76, ¶ 15, 899 A.2d 806; *State v. Walker,* 512 A.2d 354, 356 (Me.1986); *State v. Michaud,* 473 A.2d 399, 404 (Me.1984); *State v. Bahre,* 456 A.2d 860, 865 (Me.1983); *State v. Childs,* 388 A.2d 76, 81–82 (Me. 1978); *State v. Deveau,* 354 A.2d 389, 392 (Me.1976); *State v. McDonough,* 350 A.2d 556, 564 (Me.1976).

[¶ 23] However, the obvious error standard that we employ should recognize that where the trial court has concluded that there is sufficient evidence to instruct the jury on a defense, as was the case here, it necessarily follows that it was reasonably possible that the jury could have acquitted the defendant on that basis. *See* 17–A M.R.S. § 101(1), (2) (2010). A possibility refers to an occurrence that "may or may not happen." Webster's New World Compact Desk Dictionary and Style Guide 377 (2nd ed. 2002). A mere possibility that an instructional error affected the verdict is quantitatively and qualitatively less substantial than "a seriously prejudicial error tending to produce manifest injustice," or a "serious[ ] . . . injustice done to the defendant . . . so great the Law Court cannot in good conscience let the conviction stand." *Daley,* 440 A.2d at 1055 (citation omitted) (quotation marks omitted).

[¶ 24] The judicial deference owed jury decisions demands an appellate standard of review more rigorous than one narrowly focused on whether it was reasonably possible that the jury would have returned a different verdict.

[¶ 25] The case for a more demanding obvious error test is also supported by the principles underlying Rule 52(b), which are identical to the principles underlying the federal rule for reviewing plain error. *Compare* M.R.Crim. P. 52(b), *with* Fed. R.Crim.P. 52(b). The federal rule provides: "A plain error that affects substantial rights may be considered even though it was not brought to the court's attention." Fed.R.Crim.P. 52(b). Obvious error and plain error are substantively alike. *State v. Burdick,* 2001 ME 143, ¶ 13 n. 9, 782 A.2d 319. The United States Supreme Court has emphasized that the language of Federal Rule 52(b) is permissive, but that courts should exercise their remedial discretion under the rule only where an unpreserved error affects substantive rights and "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano,* 507 U.S. 725, 736, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (alteration in original) (quotation marks omitted).

[¶ 26] In 2001, we quoted and applied the Supreme Court's formulation of the obvious error standard in *Burdick:*

> Our review pursuant to the "obvious error" standard of M.R.Crim. P. 52(b) is similar to the "plain error" review announced by the U.S. Supreme Court pursuant to Fed.R.Crim.P. 52(b): Under that test, before an appellate court can correct an error not raised at trial, there must be (1) "error," (2) that is "plain," and (3) that "affects substantial rights." If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error ["]seriously affects the fairness and integrity, or public reputation of judicial proceedings.["]

2001 ME 143, ¶ 13 n. 9, 782 A.2d 319 (quoting *Johnson v. United States,* 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (citations omitted)).

[¶ 27] This analysis focuses on the degree to which the error prejudiced the jury's deliberations or the defendant's rights, measured in the broader context of the entire trial record. We also noted in *Burdick* that if the claimed error is of constitutional dimension, the appellate discretion afforded by the fourth criterion is

considerably reduced and "we must be convinced beyond a reasonable doubt that the error did not affect [the defendant's] substantial rights." 2001 ME 143, ¶ 29, 782 A.2d 319.

[¶ 28] As with most human endeavors, trials are inherently imperfect and unintended errors inevitably occur. Thus, absent a constitutional error, a jury's verdict should be upset based on an unpreserved error only where the injustice resulting from the error is truly manifest—that is, it is "direct, obvious, and observable." Black's Law Dictionary 1048 (9th ed. 2009). The four required criteria identified in *Burdick* are in keeping with the high threshold of proof necessary for an unpreserved trial error to be fairly described as having produced manifest injustice.

[¶ 29] We thus clarify that we will henceforth apply the four-part *Burdick* test when conducting obvious error review, and that we will no longer rely on the less deferential *McKeough* "reasonable possibility" standard. For an error or defect to be obvious for purposes of Rule 52(b), there must be (1) an error, (2) that is plain, and (3) that affects substantial rights. If these conditions are met, we will exercise our discretion to notice an unpreserved error only if we also conclude that (4) the error seriously affects the fairness and integrity or public reputation of judicial proceedings.

B. Obvious Error Applied

[¶ 30] Pabon asserts that the trial court's failure to include the dwelling-place exception to the duty to retreat in its jury instructions constitutes obvious error. The State contends that the court's failure to instruct was error, but that the error was not so highly prejudicial as to have deprived Pabon of substantial rights. In effect, the State's position focuses our ob-

vious error analysis on the third *Burdick* factor.

[¶ 31] In support of his position, Pabon cites *State v. Laverty*, 495 A.2d 831, 832 (Me.1985), where the defendant was convicted of manslaughter for the stabbing death of his roommate. Laverty was in his "dwelling place" for purposes of the dwelling-place exception at the time of the crime. *Id.* at 833 (citation omitted). As in this case, the court failed to instruct the jury that a person who is not the initial aggressor has no duty to retreat from his or her own dwelling place before using deadly force in self-defense. *Id.* at 832. We viewed this omission as obvious error and vacated the conviction, concluding that "a complete instruction negating the duty to retreat in one's own dwelling place was directly relevant [and that g]iven the variety of factual accounts put before the jury, the jury could have found that the defendant was justified in using force in defense of himself." *Id.* at 833.

[¶ 32] *Laverty's* emphasis on the "variety of factual accounts" present in that case underscores that a court's omission of the dwelling-place exception to the duty to retreat from its jury instructions is not necessarily error that rises to the level of obvious error. *See id.*

[¶ 33] For the dwelling-place exception to the duty to retreat to apply, a defendant must not have been the "initial aggressor" in the use of deadly force. 17-A M.R.S. § 108(2)(C)(3)(a). Here, the trial court instructed the jury on self-defense having found that the issue was generated by the evidence. *See* 17-A M.R.S. § 101(1) (2010) (providing that the State must disprove the existence of a defense beyond a reasonable doubt if the defense "is in issue as a result of evidence admitted at the trial that is sufficient to raise a reasonable doubt on the issue").

[¶ 34] The United States Supreme Court has recognized that an error affects a criminal defendant's substantial rights if the error was sufficiently prejudicial to have affected the outcome of the proceeding. *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). The United States Court of Appeals for the First Circuit has further elaborated that under this standard, "the party asserting plain error ... must show 'a *reasonable probability* that, but for [the error claimed], the result of the proceeding would have been different.'" *United States v. Padilla*, 415 F.3d 211, 220–21 (1st Cir. 2005) (emphasis added) (alteration in original) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 82, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004)); *see also United States v. Hebshie*, 549 F.3d 30, 44 (1st Cir.2008); *United States v. Brandao*, 539 F.3d 44, 58 (1st Cir.2008); *United States v. Caraballo–Rodriguez*, 480 F.3d 62, 69–70 (1st Cir.2007); *United States v. Turbides–Leonardo*, 468 F.3d 34, 39–40 (1st Cir. 2006); *United States v. Antonakopoulos*, 399 F.3d 68, 77–79 (1st Cir.2005).

[¶ 35] As is clear from federal case law, the third prong of the Rule 52(b) test addresses whether the error "affected the outcome of the [trial] court proceedings." *Olano*, 507 U.S. at 734, 113 S.Ct. 1770. The only relevant departure in our prior case law on this question involves the degree of certainty because we have previously required no more than a reasonable *possibility* that, but for the claimed error, the outcome of the proceeding would have been different, whereas the federal standard demands a reasonable *probability*. Today we affirmatively adopt the federal reasonable probability standard as part of the third element of the Rule 52(b) test. *See Hebshie*, 549 F.3d at 44; *Brandao*, 539 F.3d at 58; *Caraballo–Rodriguez*, 480 F.3d at 69–70.

[¶ 36] To determine whether in this case there is a reasonable probability that the instructional error affected the outcome of the proceeding, we turn to examine the evidentiary record. Fusco testified that Pabon's attack against her was unprovoked and methodical. She explained that she was walking away from Pabon when he began to repeatedly stab her. There was no physical evidence suggesting that Pabon had been the subject of any aggression by Fusco in the moments that preceded his attack. Fusco explained that Pabon "took his time" and that he was "picking and choosing where he stabbed [her]." When the police arrived and asked Pabon what had happened, Pabon repeatedly responded that he had stabbed Fusco and he said nothing suggesting that Fusco was the initial aggressor. Pabon did not dispute Fusco's account when he testified. Instead, he claimed that he could not remember what happened in the kitchen just prior to and during the attack. The testimony of Fusco's trauma surgeon and Pabon's admissions to the police that he had stabbed her all corroborate Fusco's account.

[¶ 37] The only remaining evidence that touched upon the moments before the stabbing was Pabon's tape-recorded comment, made as he sat in the back of the police cruiser soon after the stabbing, that Fusco "had a knife in her hand" and was screaming. Even if the jury found this statement credible and chose to disregard Fusco's account, that finding does not lead to the conclusion that Fusco was the initial aggressor. Without more, the fact that Fusco was holding a knife and screaming does not render her an aggressor. In addition, Fusco's alleged threat to stab Pabon, made earlier on the streets of Portland, does not bear on who was the initial aggressor inside the apartment an hour or, more likely, several hours later. *See State v. Winchenbach*, 658 A.2d 1083, 1085 (Me.

1995) (concluding that evidence of which party was the aggressor during a confrontation inside their trailer had no bearing on who was the aggressor after the parties exited the trailer and the defendant struck the victim with a baseball bat).

[¶ 38] Pabon's single recorded comment that Fusco was holding a knife and screaming was a thin reed upon which to rest a finding that Pabon was not the initial aggressor sufficient to enable the jury to conclude that the dwelling-place exception applied. Given the substantial and largely un-rebutted evidence establishing that Pabon was the initial aggressor during the kitchen confrontation, it is not reasonably probable that the jury would have reached a different verdict if it had been instructed on the dwelling-place exception.

[¶ 39] Our focus on the third *Burdick* factor points to an inescapable conclusion: the court's omission of the dwelling-place exception from its self-defense instruction was not obvious error.

The entry is:

Judgment affirmed.

SILVER, J., with whom MEAD, J., joins, dissenting.

[¶ 40] I respectfully dissent from the opinion of the majority. The court's failure to give an accurate self-defense instruction in this case worked a manifest injustice affecting Pabon's substantial rights because it denied the jury the opportunity to evaluate Pabon's self-defense argument. For this reason, the self-defense instruction was obvious error, and the judgment should be vacated and remanded for a new trial.

[¶ 41] As the majority states, the use of deadly force is justified when the person reasonably believes it is necessary for self-defense and reasonably believes that the other person is about to use unlawful deadly force against him. 17–A M.R.S. § 108(2)(A)(1) (2010). A person is not justified in using deadly force if he knows that he can retreat with complete safety, "except that the person . . . is not required to retreat if the person . . . is in the person's dwelling place and was not the initial aggressor." *Id.* § 108(C)(3)(a). It is undisputed that the stabbing took place in Pabon's home, and the parties agree that the dwelling-place exception to the duty to retreat rule applies in this case. *See State v. Laverty*, 495 A.2d 831, 833 (Me.1985) (holding that "the 'dwelling place exception' to the retreat rule is applicable even if the assailant is lawfully present" as in the case of a co-dweller). Therefore the court's failure to include this exception in the instruction was error. Because Pabon did not object to the instruction on this basis at trial, we review it for obvious error.

[¶ 42] Here, both Pabon's substantial rights and the fairness of the proceeding are implicated. We have held on many occasions that "where self-defense is an issue essential to the defendant's case, a failure to so instruct amounts to obvious error because the instructions are crucial to defendant's receiving a fair trial." *State v. Corbin*, 1997 ME 41, ¶ 8, 691 A.2d 188 (quoting *State v. Davis*, 528 A.2d 1267, 1270 (Me.1987)). In many of those cases, we have found obvious error where only the defendant's testimony supported self-defense. *See, e.g., State v. Bard*, 2002 ME 49, ¶ 6, 793 A.2d 509.

[¶ 43] In these cases, "in order to maintain the basic integrity of judicial proceedings, we will notice error, if error there be, that works substantial injustice, whether or not it is brought to the attention of the trial or appellate court. The rule may be called into play . . . in order to avoid depriving the defendant of his

constitutional right to a fundamentally fair trial and thus prevent a miscarriage of justice." *State v. Bahre,* 456 A.2d 860, 864 (Me.1983) (citations omitted). A complete and accurate self-defense instruction, when the issue is raised by the evidence, is a requirement of constitutional dimension. A failure to deliver that instruction is obvious error. *See id.* at 866.

[¶ 44] Here, Pabon admitted to stabbing Fusco, and therefore his entire case rested on his two defense theories, one of which was self-defense. "When the claimed error is the omission of a particular instruction, we will vacate the judgment only if 'the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.'" *State v. Burdick,* 2001 ME 143, ¶ 30, 782 A.2d 319 (quoting *Neder v. United States,* 527 U.S. 1, 19, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)). Contrary to the majority's assertion, this is not a case where there was "no evidence" supporting a finding that the victim was the initial aggressor in the struggle resulting in the stabbing. *See State v. Winchenbach,* 658 A.2d 1083, 1085 (Me.1995). Pabon's statement on the tape recording heard by the jury, that Fusco "had a knife in her hand—she was screaming to me—she had a knife in her hand and I got one too," was supported and made more credible by evidence that Fusco had threatened to stab Pabon only a few hours before. The jury could also have believed that Pabon felt threatened by Fusco, despite his size and gender, in light of that particular threat, the fact that Pabon called 911 twice that night to request police assistance with Fusco, Pabon's testimony that he was concerned about going home because Fusco "gets physical," and his testimony that Fusco had previously bragged to him about injuring people in fights.

[¶ 45] These facts went to the elements of a self-defense justification and generated an issue of self-defense for the State to disprove. It is for the jury to weigh the evidence presented and either accept or reject that defense. *Bard,* 2002 ME 49, ¶¶ 11, 16, 793 A.2d 509. The determination of whether Pabon or Fusco was the initial aggressor is a part of this jury question, and cannot be separated from the issue of self-defense generally, which the majority acknowledges was raised by the evidence. *See State v. Michaud,* 1998 ME 251, ¶ 17, 724 A.2d 1222 (stating that "[i]n determining whether the evidence is sufficient to raise the issue of self-defense, a trial court must view the evidence in the light most favorable to the defendant," and that "[f]or the limited purpose of determining whether self-defense was in issue, the court should have suspended its disbelief and assumed that [the defendant's] story was true" (quotation marks omitted)).

[¶ 46] The majority changes the established law, and takes the determination of whether a defendant acted in self-defense away from the jury. We should adhere to our past reasoning and remand for a new trial despite our own feelings on which story is more convincing. As we held in *State v. Sprague,* which involved a dispute regarding who was the initial aggressor:

> Initially, we find that the evidence, viewed in the light most favorable to the State, would rationally support the conclusion that [the defendant] is guilty beyond a reasonable doubt of the crime of aggravated assault. We hold, however, and the State concedes, that because the court's instructions to the jury did not ensure its consideration of all the relevant defenses available to him, [the defendant] was denied a fair trial.

617 A.2d 564, 565 (Me.1992).

[¶ 47] The evaluation of the credibility of witnesses and the weight of the evi-

dence are the province of the fact-finder. *See State v. Cook*, 2010 ME 81, ¶ 7, 2 A.3d 313. An appellate court that did not hear and see the witnesses and exhibits first-hand cannot assess their probable effect on the jury. We do not know which witnesses, if any, the jury found credible, or how they evaluated the witnesses' demeanor and testimony. In particular, the majority relies in large part on Fusco's testimony, which the jury may have disbelieved because her account of the timing of events was contradicted by the first 911 call and by multiple witness accounts, and because her description of what transpired when Pabon first arrived home was contradicted by the testimony of the taxicab driver. As the *Bard* Court observed, "[w]hether the State meets its burden to disprove the defense of self-defense is for the jury to decide—it is within the jury's purview to weigh the evidence presented and either accept or reject the defense. The jury should have had the means and the authority to do that with a self-defense instruction." 2002 ME 49, ¶ 16, 793 A.2d 509 (citation omitted).

[¶ 48] This is not a case with a minor technical error. Rather, the court misstated the law on a central issue in the case, and that misstatement was repeated several times by the court and emphasized by the prosecutor, with clear impact on Pabon's substantial right to have the jury consider his defense. As in many of our prior cases, "because the court's instructions to the jury did not ensure its consideration of all the relevant defenses available to him, [the defendant] was denied a fair trial." *Sprague*, 617 A.2d at 565. The effect of that error was compounded by the State's emphasis in its closing on Pabon's failure to retreat. "Since the jury never received correct instructions on the relevant law from the presiding justice, they may well have found [the defendant] guilty on just such reasoning as the prose-

cutor's argument suggested. That is obvious error, as envisioned by Rule 52(b), compelling reversal." *Bahre*, 456 A.2d at 865. A fair trial may produce the same result, but it is required nonetheless, and did not occur here.

[¶ 49] In conclusion, the error at issue here was manifest and worked a substantial injustice by denying Pabon's right to a fair trial. I would therefore vacate the judgment of conviction and remand for a new trial. For these reasons, I dissent from the opinion of the majority.