MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2025 ME 14
Docket:      Aro-23-418
Argued:      November 13, 2024
Decided:     February 11, 2025

Panel:       STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.

STATE OF MAINE

v.

KEARA M. BERNIER

MEAD, J.

[¶1]   Keara M. Bernier appeals from a judgment of conviction for aggravated assault (Class B), 17-A M.R.S. § 208(1)(B) (2024), entered by the trial court (Aroostook County, *Nelson, J.*) following a jury trial.  She first contends that the trial judge questioned her veracity during her testimony and thereby denied her a fair trial.  We disagree.  She next contends that the court erred when, in instructing the jury on the use of deadly force in self-defense, it instructed that Bernier had a duty to retreat if she could do so with complete safety, but failed to instruct that she had no duty to retreat if she was in her dwelling place and was not the initial aggressor.  *See* 17-A M.R.S. § 108(2)(C)(3)(a) (2024).  We agree, vacate the judgment of conviction, and

2

remand for a new trial.[1]

## I.  BACKGROUND

[¶2]  Viewing the evidence admitted at trial in the light most favorable to the jury's verdict, *see State v. Healey*, 2024 ME 4, ¶ 2, 307 A.3d 1082, the jury could find that on or about June 6, 2022, Bernier and the victim, whom Bernier had been in a relationship with for about a year, were at the victim's home, where Bernier also lived.  That afternoon, the victim was inside by the stove smoking a cigarette and drinking a beer; Bernier was outside having a conversation on her tablet with a man.  The relationship between the victim and Bernier had been deteriorating for some time, and the victim acted on his wish that Bernier move out by putting some of her clothes out on the back porch.

[¶3] When Bernier came inside some fifteen minutes later and asked why her clothes were on the porch, the victim told her, "Because you need to go." Bernier said, "Where's my bat," and retrieved an aluminum baseball bat from a closet.  As the victim stood next to the stove, Bernier, who was "angry," walked up to the victim and hit him in the head with the bat, "splitting [his] head open"

---

[1] Bernier also contends that the evidence presented at trial failed to establish all the necessary elements of aggravated assault, specifically asserting that "the evidence failed to establish that the bat used by [her] could inflict 'a substantial risk' of death or serious bodily injury in the manner it was used."  We disagree and do not further address the issue.

and causing it to bleed significantly for several hours. The victim made no attempt to defend himself because he did not think that Bernier would actually hit him with the bat. The victim was left "in shock," and Bernier began to cry and apologize as she helped to bandage the victim's head wound.

[¶4] The victim did not seek medical attention or call the police; that night he went to bed and Bernier slept on the couch. The following day, the victim went to work and at the suggestion of his boss called to report the incident to the Maine State Police, partially as a way to get Bernier out of his house. A state trooper met with the victim and saw a large bruise on the side of his head and some dried blood.

[¶5] In July 2022, Bernier was indicted for aggravated assault (Class B), 17-A M.R.S. § 208(1)(B). The court held a jury trial on September 14-15, 2023. After the State rested its case-in-chief, and again at the close of the evidence, Bernier moved for a judgment of acquittal pursuant to M.R.U. Crim. P. 29; each motion was denied. The jury returned a guilty verdict. At the sentencing hearing, the court entered judgment and sentenced Bernier to seven years' imprisonment, with all but six months suspended, and three years of probation. Bernier timely appealed. M.R. App. P. 2B(b)(1).

## II.  DISCUSSION

### A.    The Court's Instructions to Bernier During Her Testimony

[¶6]   The victim was the first witness at the trial.  At the outset of his testimony, the prosecutor advised him: "If you're nervous, just take your time to think about the question. . . . Just make sure that the answer that you give is as honest as you can."  The court interjected: "[Y]ou have an absolute obligation to testify truthfully.  Do you understand that? . . . [T]he distinction as honestly as you can is not the standard."

[¶7]   When the State later cross-examined Bernier, the subject of a witness's obligation to testify truthfully arose again.  The prosecutor opened his cross by telling Bernier: "I know this . . . must be a difficult time for you.  As you know, you're under an obligation to always answer my questions truthfully."  She responded, "Oh, don't you worry."  It soon became apparent that Bernier had a tendency to be nonresponsive when answering questions, requiring the court to direct her to answer the question that was asked—for example:

> STATE:  Okay.  And so immediately after you hit him with the bat, you were not scared anymore?
>
> BERNIER:  Have you ever seen someone's eyes go black?
>
> COURT:  Do you understand the question?
>
> BERNIER:  Yeah, I do understand the question.

COURT: Please, just answer the question.

[¶8]  At other times when directing Bernier to answer the question that was asked, the court added a directive to answer questions truthfully:

COURT: Well, just rephrase the question and listen carefully to the question and just answer it truthfully.

. . . .

COURT: [T]he Court's unclear as to whether the witness truly understood the question.  Please ask that question again.  If you don't understand it, ma'am, please let us know.  Otherwise, listen to the question and, again, just answer truthfully.

. . . .

COURT: Well, the question—and this is where we're getting bogged down.  The question to you is do you recall . . . making such a statement to the trooper?  Either you remember saying that to the trooper or you do not remember saying that to the trooper, which could either be you simply don't remember it or that you did not in fact say it.  But that's the question.  Do you understand what the question is, yes or no?

BERNIER:  Yes, I understand the question.

COURT: And do you recall telling [the trooper] that you pushed [the victim]?

BERNIER: I did not push [the victim].

COURT: That's not the question.

. . . .

COURT: Ma'am, ma'am. . . . The witnesses' job is simply to listen to the questions and testify truthfully. If there's any question that's objected to, the Court will rule on it and my determination will be whether you have to answer or whether you do not. And so that's the way it's going to proceed.

[¶9] Bernier contends that the court's references to answering questions truthfully were a commentary on her credibility that demonstrated the court's partiality and damaged her standing with the jury, depriving her of a fair trial.

[¶10] Because Bernier did not object at the time, we review for obvious error. *See State v. Labbe*, 2024 ME 15, ¶ 42, 314 A.3d 162; *State v. Philbrick*, 669 A.2d 152, 156 (Me. 1995). "Under that standard, we will not disturb a judgment unless there is (1) an error, (2) that is plain, and (3) that affects substantial rights. To affect substantial rights, the error must be sufficiently prejudicial that there is a reasonable probability that it affected the outcome. This standard is further heightened for a jury verdict, where the error must also seriously affect the fairness and integrity or public reputation of judicial proceedings." *Labbe*, 2024 ME 15, ¶ 42, 314 A.3d 162 (alteration, citations, and quotation marks omitted). "We will not vacate a conviction unless the conduct of the trial court was so highly prejudicial and calculated to result in injustice that an unjust verdict would inevitably result or that the accused did not have that impartial trial to which [s]he is entitled under the law and the constitution.

The failure to object will itself be a consideration in determining whether the error is obvious and highly prejudicial." *Philbrick*, 669 A.2d at 156 (alteration, citation, and quotation marks omitted).

[¶11]  Although the obvious error standard imposes a significant burden on Bernier as the appellant, we are cognizant that

> [a] defendant is guaranteed an impartial trial by the United States and Maine Constitutions.  This guarantee encompasses impartiality on the part of the trial judge, both in word and conduct.  Thus, a trial justice is prohibited from expressing an opinion upon issues of fact arising in a case.  It is of paramount concern that a judge not participate in any manner from which the jury may infer that he endorses the cause of one side.  Any such expression by a court generally is sufficient cause for a new trial at the request of the aggrieved party.

*Id.* at 155-56 (alterations, footnotes, citations, and quotation marks omitted). Specifically, the trial court "may not . . . create an impression that it doubts the defendant's veracity."  *Id.* at 156 n.10.

[¶12]  In addition to her constitutional protections, Bernier's right to an impartial bench is protected by statute:

> During a jury trial the presiding justice shall rule and charge the jury, orally or in writing, upon all matters of law arising in the case but shall not, during the trial, including the charge, express an opinion upon issues of fact arising in the case, and such an expression of opinion is sufficient cause for a new trial if either party aggrieved thereby and interested desires it, and the same

shall be ordered accordingly by the law court on appeal in a civil or criminal case.

14 M.R.S. § 1105 (2024).

[¶13] Although in isolation the court's direction to Bernier to answer questions "truthfully" might be seen as skepticism on the part of the trial judge that Bernier had been doing so, we conclude that the record, viewed as a whole, demonstrates that the court's chief purpose was to keep Bernier focused on answering the questions asked and avoiding nonresponsive answers. The court began directing witnesses to answer questions "truthfully" when it explained to the victim his obligation to do so at the outset of the trial, and it maintained that pattern when Bernier testified. The tenor of the court's colloquies with Bernier was not indicative of the judge doubting that she was telling the truth, but rather indicated a degree of restrained frustration with her habit of giving nonresponsive answers. The jury would have observed that the court was polite with Bernier and maintained a professional mien in controlling the trial.

[¶14] Because the record does not a establish a "reasonable probability" that the court's direction to Bernier to answer questions "truthfully" affected the outcome of the trial, there was no obvious error requiring that the judgment be vacated on this ground. *See Labbe*, 2024 ME 15, ¶ 42, 314 A.3d 16.

## B.     Deadly Force Instruction

[¶15] Bernier testified that before she struck the victim with the baseball bat, he became angry when she refused to buy him alcohol and "started yelling and having a fit." When Bernier went out to her car and called a friend to advise the friend of what was happening, the victim "came out to [Bernier's] car and started . . . slamming his hands and . . . hitting [Bernier's] window." After Bernier went back inside the house, the victim resumed "yelling and having a fit," "slammed his fists on the counter," and "hit the fridge"; Bernier then warned him, "[I]f you come at me one more time, I'm gonna take the bat out." Bernier said that she was "scared . . . [b]ecause [the victim] had been physical with me" and had in the past "punched me, kicked me, . . . slapped me, [and] put me in headlocks." She thought the victim was going to "knock [her] out."

[¶16] The parties and the court agreed that a self-defense instruction had been generated by Bernier's testimony. After conferring with the parties, the court elected to give the jury both deadly and nondeadly force instructions, orally and in writing.[2]

---

[2] In *State v. Ouellette*, we said that

> [w]hen the court is unable to determine whether the defendant used deadly or nondeadly force as a matter of law, the court must instruct the jury as to both and allow the jury to make the preliminary determination of whether the defendant used deadly or nondeadly force. This method preserves the defendant's fundamental right to a jury trial given that weighing the evidence is the sole prerogative of the jury and

[¶17]   Bernier's appeal focuses on the court's deadly force instruction, specifically the portion of the instruction setting out when a person is not justified in using deadly force in self-defense.  The court instructed the jury:

> A person is never justified in using deadly force if she provoked the encounter leading to the use of deadly force or if she knows that she can retreat from the encounter with complete safety.

[¶18]   The governing statute is more extensive in that it provides an exception to the general duty to retreat before using deadly force:

> [A] person is not justified in using deadly force . . . if:
>
> . . . .
>
> **(3)**  The person knows that the person . . . can, with complete safety:
>
> > **(a)**  Retreat from the encounter, *except that the person . . . is not required to retreat if the person . . . is in the person's dwelling place and was not the initial aggressor*.

17-A M.R.S. § 108(2)(C)(3)(a) (emphasis added).

[¶19]   We conclude that the omission of the dwelling-place exception from the jury instructions requires that the judgment be vacated.  We have said that "where self-defense is an issue essential to the defendant's case, the court's

---

the trial court should decide whether to give an instruction without weighing the evidence.

2012 ME 11, ¶ 16, 37 A.3d 921 (alteration, citations, and quotation marks omitted).

failure to instruct on self-defense pursuant to section 108 deprives the defendant of a fair trial and amounts to obvious error."[3]  *State v. Ouellette*, 2012 ME 11, ¶ 21, 37 A.3d 921 (quotation marks omitted).  Further, "[i]f the court determines that one type of self-defense is generated as a matter of law, the court's jury instructions must contain an explanation of that form of self-defense."  *Id.* ¶ 15.

[¶20]  In *State v. Laverty*, we faced the precise issue presented here and resolved it by holding:

> [W]e conclude that the "dwelling place exception" to the retreat rule is applicable even if the assailant is lawfully present. . . . Thus, a complete instruction negating the duty to retreat in one's own dwelling place was directly relevant.
>
> We find the omission of such an instruction to be an obvious error affecting a substantial right.  Given the variety of factual accounts put before the jury, the jury could have found that the defendant was justified in using force in defense of [her]self.  In light of these circumstances, we cannot say that beyond a reasonable doubt the jury would not have resolved the issue differently had they been properly instructed.

495 A.2d 831, 833 (Me. 1985) (citations and quotation marks omitted).

---

[3]  The standard of review to be applied here is not clear.  Bernier made a *pro forma* objection to the court giving a deadly force instruction, but she did not object on the ground that the instruction omitted the dwelling-place exception to the general duty to retreat.  We assume, without deciding, that the standard of review is obvious error, as the State suggests, *see State v. Tripp*, 2024 ME 12, ¶ 29, 314 A.3d 101, but under that standard or the standard suggested by Bernier, the result here is the same.

[¶21] Twenty-six years later, we qualified the *Laverty* holding in another case where the trial court failed to include the dwelling-place exception in its jury instructions. *State v. Pabon*, 2011 ME 100, ¶¶ 15, 30, 28 A.3d 1147. Focusing on the exception's prerequisite that the person claiming self-defense not have been the "initial aggressor," 17-A M.R.S. § 108(2)(C)(3)(a), we held that when there was "substantial and largely un-rebutted evidence establishing that [the defendant] was the initial aggressor . . . , it is not reasonably probable that the jury would have reached a different verdict if it had been instructed on the dwelling-place exception." *Pabon*, 2011 ME 100, ¶¶ 33, 38, 28 A.3d 1147. In that event, "a court's omission of the dwelling-place exception to the duty to retreat from its jury instructions is not necessarily error that rises to the level of obvious error." *Id.* ¶ 32.

[¶22] Here, there was not "largely un-rebutted evidence" that Bernier was the initial aggressor. *Id.* ¶ 38. She testified at length that the victim was drunk, angry, and physically aggressive before she hit him with the bat—conduct which, in light of what she described as his history of violence toward her, she viewed as a threat to her safety. From the conflicting testimonies of the victim and Bernier, the jury could have reasonably found that either of them was the initial aggressor—a conclusion reached by the court when it decided to

give both deadly and nondeadly force instructions.[4]  Accordingly, the *Pabon* qualification of the *Laverty* rule is inapplicable.

[¶23]  There is another reason that in this case "a complete instruction . . . was directly relevant."  *Laverty*, 495 A.2d at 833.  The State emphasized to the jury in its closing argument:

> [Bernier] said she went to get a bat.  [The victim] had not assaulted her at that point.  She waited for [the victim].  She did not run.
>
> . . . .
>
> And I want to point you to four sections on the [instructions] of the use of deadly force . . . . Number two, that the Defendant knew that she could retreat from the encounter with [the victim] in complete safety.  Remember, she stated that [the victim] was standing by the stove.  She ran.  She got a bat in the closet . . . and then he started approaching her.  She was already able to run away this far.  She had previously been in her vehicle.  If she feared that [the victim] was going to come after her, she could have gone again into her vehicle.  There was no evidence today that her vehicle was not operational on this particular day.

If the jury found the State's argument persuasive, and it did not know that Bernier had no duty to retreat from her dwelling place,[5] it could have concluded

---

[4]  The court observed that given the evidence the jury heard, "they may decide that they wish to discount or disbelieve her testimony entirely and his entirely."

[5]  The State's suggestion that "[the victim's] home may no longer have been [Bernier's] dwelling place" is not persuasive.  The jury could find from the victim's testimony alone that Bernier had lived in his home for "a couple [of] years," and that, although he had been making efforts to have her move out, as of the day of the assault she had not.  Even after the assault, she remained in the victim's home and slept on the victim's couch.

that she did not act in self-defense solely because she had the opportunity to retreat and did not.

[¶24]   Accordingly, as in *Laverty*, "the omission of [a dwelling-place exception to the duty to retreat rule] instruction [is] an obvious error affecting [Bernier's] substantial right[s]," requiring that the judgment of conviction be vacated.[6]  495 A.2d at 833; *see State v. Villacci*, 2018 ME 80, ¶ 13, 187 A.3d 576 (discussing "structural flaws" in self-defense instructions amounting to obvious error).

The entry is:

Judgment vacated.  Remanded for a new trial.

---

[6]   The State also asserts that omitting the dwelling-place exception from the deadly force instruction was not error because a deadly force instruction was not generated by the evidence *ab initio*.  This is a curious position given that, in a chambers conference discussing the instructions, the State conceded that the issue of self-defense had been generated and argued that "only the deadly force instructions should be [given]."

In any event, we have said that "[a] self-defense instruction is generated if the evidence, viewed in a light most favorable to the defendant with all reasonable inferences resolved in the defendant's favor, is of such nature and quality to render the existence of all facts constituting the defense a reasonable hypothesis for the fact finder to entertain."  *State v. Asante*, 2023 ME 24, ¶ 19, 294 A.3d 131 (quotation marks omitted).  Here, viewed in the light most favorable to Bernier, the jury could have found from the evidence that the victim engaged in angry, drunken, violent behavior preceding her use of the bat—against the backdrop of a history of domestic violence committed by the victim against Bernier—which led Bernier to believe that the victim was about to use deadly force against her and that the preemptive use of deadly force to defend herself was necessary.  Whether that scenario was ultimately persuasive was for the jury to decide—all that was required to generate the instruction was that the scenario be "a reasonable hypothesis for the [jury] to entertain."  *Id.* (quotation marks omitted).

Jeremy Pratt, Esq. (orally), and Ellen Simmons, Esq., Camden, for appellant Keara M. Bernier

Todd Collins, District Attorney, and John Inglis, Asst. Dist. Atty. (orally), Caribou, for appellee State of Maine

Aroostook County Unified Criminal Docket docket number CR-2022-20182
FOR CLERK REFERENCE ONLY