MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2024 ME 15
Docket:        And-22-317
Argued:        May 9, 2023
Re-argued:     December 5, 2023
Decided:       January 31, 2024

Panel:         MEAD, JABAR, HORTON, CONNORS, and DOUGLAS, JJ.

STATE OF MAINE

v.

JACOB R. LABBE SR.

DOUGLAS, J.

[¶1]  Jacob R. Labbe Sr. appeals from a judgment of conviction entered by the trial court (Androscoggin County, *Stewart, J.*) of one count of domestic violence stalking (Class C), 17-A M.R.S. § 210-C(1)(B)(3) (2018),[1] and two counts of violation of a protective order (Class D), 19-A M.R.S. § 4011(1) (2018).[2]  *See* 15 M.R.S. § 2115 (2023).  He contends that (1) the stalking statute,

---

[1] Title 17-A M.R.S. § 210-C(1) (2018) has since been amended several times, though not in a way that is relevant to this case.  *See, e.g.*, P.L. 2019 ch. 647, § B-28 (effective Jan. 1, 2023) (codified at 17-A M.R.S. § 210-C(1)(B)(3) (2023).

[2] Sections 4001 to 4014 of Title 19-A (2018) have since been repealed and replaced by sections 4101 to 4116 of the same Title.  *See* P.L. 2021, ch. 647, §§ A-2, A-3 (effective Jan. 1, 2023) (codified at 19-A M.R.S. §§ 4101-4116 (2023)).

17-A M.R.S. § 210-A (2018),[3] is unconstitutionally vague; (2) the evidence was insufficient for a jury to convict him of domestic violence stalking; (3) the court abused its discretion by denying his request to dismiss the charges as *de minimis*; and (4) the court erred with respect to several evidentiary rulings.

[¶2]  After oral argument was held in this case on May 9, 2023, the U.S. Supreme Court issued its decision in *Counterman v. Colorado*, 600 U.S. 66 (2023), vacating a conviction under Colorado's stalking statute (which, like Maine's, employs an objective, reasonable person standard concerning the effect of an actor's communication on a victim) and holding that the First Amendment of the United States Constitution required in that case proof of a subjective *mens rea* on the part of the defendant—at a minimum, recklessness—with respect to the effect that his communications—there, Facebook Messages—had upon the victim.  In light of the *Counterman* decision, we ordered supplemental briefing and scheduled the case for re-argument.  We asked the parties to address the following questions:

> (1)    What effect, if any, does the U.S. Supreme Court's holding in *Counterman* have on Labbe's case and especially on the State's burden of proof, if any, with respect to the defendant's subjective

---

[3] Title 17-A M.R.S. § 210-A (2018) has since been amended, though not in any way that is relevant to this case.  *See, e.g.*, P.L. 2021, ch. 647, § B-24 (effective Jan. 1, 2023) (codified at 17-A M.R.S. § 210-A(1)(C) (2023)).

awareness that his conduct could cause one of the effects enumerated in 17-A M.R.S. § 210-A?

(2)     In light of principles of issue preservation and retroactivity as set forth in *Griffith v. Kentucky,* 479 U.S. 314 (1987) and similar cases, can and should the Law Court address in this appeal the issues raised by *Counterman*?

[¶3]     The parties submitted supplemental briefs addressing these questions, and five amici curiae submitted briefs on our invitation.[4] Re-argument was held on December 5, 2023.  For the reasons set out below, we affirm the conviction.

## I.  BACKGROUND

[¶4]  "Viewing the evidence admitted at trial in the light most favorable to the State, the jury could rationally have found the following facts beyond a reasonable doubt."  *See State v. Athayde*, 2022 ME 41, ¶ 2, 277 A.3d 387.

[¶5]  As of the date of trial in July 2022, Labbe and the victim had been together for nine years, had been married for five years, and had one child together.  After having been "away"[5] for several years, Labbe returned to the

---

[4]  We received amici curiae briefs from the American Civil Liberties Union and American Civil Liberties Union of Maine; the Maine Coalition to End Domestic Violence and the Maine Coalition Against Sexual Assault; the Maine Prosecutors Association; the Office of the Maine Attorney General; and Lawrence C. Winger, Esq.

[5]  The jury was not told the reason that Labbe had been "away," which was that he was serving a three-year prison sentence after being convicted in July 2017 of five counts of Class C violation of conditions of release for having contact with this same victim.  The bail conditions were in place as a

4

Lewiston area in early November 2019. Labbe had previously been subject to—and violated numerous times—a court order prohibiting contact with the victim. During his years-long absence, there was no such court order in effect, and he and the victim communicated amicably about their child.

[¶6] When Labbe returned to the area, the victim agreed to allow Labbe to have a weekend visit with the child at Labbe's mother's house, beginning on Friday, November 15. Several times over the weekend, the victim tried contacting the child and Labbe but did not get a response.[6] When Labbe did not allow the victim's mother to pick up the child that Sunday evening, the victim called the police for assistance. When the child was returned to the victim late that evening, the child was "very lethargic, withdrawn, not like communicating, laying on the couch, acting like he was extremely sick." The victim later learned that Labbe had taken the child's ADHD medication rather than administering it to the child as prescribed and had failed to return the rest of the medication, and as a result the child went a couple of days without it. Upset by what had

result of a felony charge of domestic violence assault, also involving the same victim. While in custody on that charge, he had multiple violations of bail based on jail calls to the victim in which he "cajole[d], bull[ied], and manipulate[d] her."

[6] After dropping the child off with Labbe, the victim texted or called no fewer than eight times to check on the child, but Labbe did not respond.

transpired, the victim informed Labbe that she would not allow him to see the child.

[¶7]   In the aftermath of the weekend, Labbe began texting and calling the victim, at first about retrieving some of his possessions and having additional contact with their child but also about other matters.[7]   Some of Labbe's calls and messages came from his sister's phone or his mother's phone. On November 18, the victim texted Labbe and told him to stop contacting her. The victim also blocked Labbe on Facebook.

[¶8]   The victim returned Labbe's possessions to his sister's house on November 19.  The victim also applied for and received a temporary protection from abuse order the same day.  It took a week, however, for law enforcement to find and serve Labbe with the order.  In the interim, the victim continued to receive calls and text messages "all the time" from Labbe; "[she] got private calls, no name calls, calls from his new number . . . calls from his sister's

---

[7]   The texts and calls continued, and the subjects of the texts and calls extended beyond just the child or his belongings.  Some texts were Labbe's attempts to reconcile with the victim.  For example, he texted the victim that "I'm not healing from trauma either.  What are we going todo in regard to ourbusiness and [the child]" and "[Labbe's sister] needs her phone . . . Let me know directly what u need [Labbe's email address]."  "Anyways I have to order a phone.  Dont play im having 10 people try to control my life right now.  We talked you said keepit till I find a place anyways . . . you know I hurt too.  Ill have a phone by weekends.  Please do what we said I stayed at my moms like you asked.  No matt[er] we which way I go im stuck in a web."  Still, others are difficult to decipher such as "[n]ot sure what to do with all this but if [the child] is gonna be here then its basically his stuff . . . No new shoes no underwear jewelry pictures. I'm sorry about everything theres alot of stuff I forgot about . . . Patriots gear Abercrombie send boo with my money for me to get rent taken care of through the new year and fix a truck to drive . . . Medicine. Thank you."

6

number." Even though calls and texts came from different phone numbers, the victim was able to identify Labbe as the source of the contact due to his wording choice, style of speaking, and other clues.

[¶9] On November 23, for example, the victim received a call in which the caller just breathed into the phone but did not speak. Moments later, she received a call from Labbe, in which he told the victim he loved her and asked about retrieving his personal belongings at the victim's house.[8] The victim again told Labbe to stop calling her and to leave her alone but immediately afterward received several calls from a private number that she did not pick up.

[¶10] On November 27, 2019, Labbe was served with the temporary protection order, which prohibited him from having any contact, directly or indirectly, with the victim. When finally served, Labbe acknowledged to the officer that he understood the terms of the protection order and that the order was effective immediately.[9] Several days later, the victim reported to police

---

[8] As referenced earlier, the victim testified that she already had delivered all ("probably nine" tote bags) of Labbe's personal possessions to his sister's house on November 19 while Labbe was present.

[9] Although Labbe argued at trial that the temporary protection order was "confusing" because the issuing judge had crossed out the child's name thus making it effective only as to the victim, competent evidence supports a finding that Labbe understood that a court order was in effect and that it prohibited him from contacting the victim.

that she had received numerous text messages, phone calls, and voicemail messages from Labbe on December 2 and December 3.[10]

[¶11] When the victim met with police, she seemed "at her wit's end" and frustrated; she reported feeling "[u]nsafe" and "scared for [her] family," particularly because Labbe continued to contact her even after being served with the protection order. She had to change her phone number multiple times between November 15 and December 3. The victim was pregnant at the time of the events and reported experiencing distress, anxiety, and pregnancy complications because of her interactions with Labbe. She felt that Labbe "didn't abide by any of" the court orders and that she "couldn't leave the house because, you know what I mean, anything could happen."

[¶12] Labbe was indicted in March 2020 on one count of domestic violence stalking (Class C), 17-A M.R.S. § 210-C(1)(B)(3), and two counts of violation of a protection order (Class D), 19-A M.R.S. § 4011(1). He was convicted on all counts after a jury trial in July 2022 and sentenced to two and

---

[10] After being served with the order, from November 27 to December 3, Labbe called or texted the victim multiple times (no fewer than twenty) from different numbers. In one message, he said, "I [didn't] want you to block. Can we communicate without others being involved"; in another, "Xy"; in a third, "Amore eterno F.b was crazy lookin through [with three sad-face emojis]." "Amore eterno" referenced a tattoo that had special meaning to them years ago when their relationship was just forming.

8

a half years on Count 1[11] and to one year for both Counts 2 and 3, with the sentence imposed in Counts 2 and 3 to run concurrently with the sentence imposed in Count 1. Labbe timely appealed his conviction. *See* 15 M.R.S. § 2115; M.R. App. P. 2B(b)(2).

## II. DISCUSSION

[¶13] We first address the four issues that Labbe raises in his appeal and then consider the two supplemental questions we posed with respect to the application and effect of *Counterman*.

## A. Vagueness

[¶14] Labbe challenges his conviction on Count 1, domestic violence stalking, *see* 17-A M.R.S. § 210-C(1)(B)(3), on the ground that the underlying stalking statute is unconstitutionally vague.[12] When a statute is challenged as

---

[11] Although Count 1 of the indictment charged a Class C offense under 17-A M.R.S. § 210-C(1)(B)(3), the judgment and commitment and the docket record indicate a conviction under 17-A M.R.S. § 210-C(1)(A), which is a Class D misdemeanor. Labbe stipulated to the additional element (one or more convictions for violating a bail condition prohibiting contact with an alleged domestic violence victim) required for a conviction under subsection 1(B)(3) as opposed to a conviction under subsection (1)(A). Accordingly, we direct an amendment of the docket and the judgment and commitment form to correctly reflect that Labbe was convicted of a Class C offense under 17-A M.R.S. § 210-C(1)(B)(3). *See State v. Osborn*, 2023 ME 19, ¶ 15 n.8, 290 A.3d 558.

[12] Because Labbe does not indicate whether his claim is rooted in the state or federal constitution and the parties have failed to argue that the due process clauses of the two constitutions should yield different interpretations in the context of a vagueness challenge, we decline to undertake an independent analysis of the Maine Constitution's due process clause here. *See State v. Thomas*, 2022 ME 27, ¶ 13 n.3, 274 A.3d 356 ("Just as certain considerations of judicial restraint ordinarily impel us to ground a decision on state, rather than federal, law, other considerations of judicial restraint lead us to refrain from deciding important state constitutional issues that have been neither briefed nor argued." (alterations and quotation marks omitted)).

unconstitutionally vague, we review the statute de novo. *State v. Reckards*, 2015 ME 31, ¶ 4, 113 A.3d 589. Because statutes are presumed constitutional, the party asserting a vagueness challenge bears the burden of demonstrating that "the statute has no valid application or logical construction." *State v. Nisbet*, 2018 ME 113, ¶ 17, 191 A.3d 359 (quotation marks omitted).

[¶15] "[A] criminal statute is unconstitutionally vague when it fails to provide sufficient definiteness that an ordinary person can understand what conduct is forbidden and encourages arbitrary and discriminatory enforcement. The statutory language does not require objective quantification, mathematical certainty, and absolute precision, and we will uphold the statute if any reasonable construction will support it." *State v. Aboda*, 2010 ME 125, ¶ 14, 8 A.3d 719 (citations and quotation marks omitted). We analyze whether a statute is unconstitutionally vague on the facts of the particular case presented and not "in all conceivable factual contexts." *Nisbet*, 2018 ME 113, ¶ 18, 191 A.3d 359 (quotation marks omitted); *see Aboda,* 2010 ME 125 ¶ 15, 8 A.3d 719 (holding that vagueness challenges are assessed based on the circumstances of an individual case).

[¶16] Title 17-A M.R.S. § 210-C(1) provides:

A person is guilty of domestic violence stalking if . . . [t]he person violates Section 210-A [of Title 17-A] and the victim is a family or

household member . . . [] and at the time of the offense . . . [h]as one or more prior convictions for violating Title 15, section 1092, subsection 1, paragraph B when the condition of release violated is specified in Title 15, section 1026, subsection 3, paragraph A, subparagraph (5) or (8) when the alleged victim in the case for which the defendant was on bail was a family or household member.

Section 210-A, the underlying stalking statute referenced in section 210-C, provides:

A person is guilty of stalking if . . . [t]he actor intentionally or knowingly engages in a course of conduct directed at or concerning a specific person that would cause a reasonable person . . . [t]o suffer serious inconvenience or emotional distress.

Labbe's challenge centers specifically upon the definition of "course of conduct" in section 210-A, which he claims is too broad and provides no notice that his actions here—calling and texting the victim—would violate the statute. His argument is unpersuasive.[13]

[¶17]  Section 210-A(2)(A) defines "course of conduct" as:

*2 or more acts*, including but not limited to acts in which the actor, *by any action, method, device or means*, directly or indirectly follows, monitors, tracks, observes, surveils, threatens, *harasses or communicates to or about a person* or interferes with a person's property.

---

[13]  We limit our review to the statutory language of the stalking statute, 17-A M.R.S. § 210-A(1)(A)(1), (2), because it is the only this element of his conviction under 17-A M.R.S. § 210-C(1)(B)(3) that he challenges on appeal as unconstitutionally vague.

17-A M.R.S. § 210-A(2)(A) (emphasis added).  A person who intentionally or knowingly engages in conduct "by any action, method, device or means" that is "directed at or concerning a specific person" commits the offense if such conduct "would cause a reasonable person . . . [t]o suffer serious inconvenience or emotional distress."  *Id.* § 210-A.  The statute also defines "emotional distress" and "serious inconvenience":

> **D.** "Emotional distress" means mental or emotional suffering of the person being stalked as evidenced by anxiety, fear, torment or apprehension that may or may not result in a physical manifestation of emotional distress or a mental health diagnosis.
>
> **E.** "Serious inconvenience" means that a person significantly modifies that person's actions or routines in an attempt to avoid the actor or because of the actor's course of conduct. "Serious inconvenience" includes, but is not limited to, changing a phone number, changing an electronic mail address, moving from an established residence, changing daily routines, changing routes to and from work, changing employment or work schedule or losing time from work or a job.

*Id.* § 210-A(2).

[¶18]  While broad, the definition of "course of conduct" is plain and understandable when read in context with the entirety of section 210-A.  Two or more instances of intentional or knowing conduct directed at a specific person which would cause a reasonable person to experience, for example, "anxiety," "fear," or "torment," or to cause a person to "significantly modif[y]

that person's actions or routines in an attempt to avoid the actor or because of the actor's conduct," may constitute stalking. *See id.* § 210-A.

[¶19]  That was precisely the situation here.  Labbe subjected the victim to repeated contacts by phone calls and texts, despite her telling him to stop, changing her phone number, and even securing a protection order prohibiting him from contacting her.  Labbe continued contacting the victim even *after* being served with the protection order.  As a result of Labbe's conduct, the victim constantly "lived on edge" and undertook significant actions in her attempt to avoid him.

[¶20]  Labbe's contention that the Legislature could not have intended this type of behavior to constitute stalking misses the import of the statute.  In 2007, the Legislature amended section 210-A to broaden its reach beyond traditional notions of "stalking"—one person physically following or tracking another—to capture "a stalker's use of new technologies," such as cell phones. *See* P.L. 2007, ch. 685, § 3.  Accordingly, "[t]here is nothing about the statute that would require a person of ordinary intelligence to guess at its meaning," *State v. Peck*, 2014 ME 74, ¶ 11, 93 A.3d 256, especially a person with Labbe's history with this victim, including five prior convictions for related conduct. *See* n.5*, supra.*  Labbe has failed to meet his burden of demonstrating that

section 210-A, on the particular facts of this case, "has no valid application or logical construction." *Nisbet,* 2018 ME 113, ¶ 17, 191 A.3d 359.

**B.     Sufficiency of the Evidence**

[¶21]  Labbe next argues that the evidence was insufficient for a jury to convict him of domestic violence stalking because his communications with the victim were nonthreatening and because he did not follow or track the victim. "When reviewing a judgment for sufficiency of the evidence, we view the evidence in the light most favorable to the State to determine whether the fact-finder could rationally have found each element of the offense beyond a reasonable doubt.  We defer to all credibility determinations and reasonable inferences drawn by the fact-finder, even if those inferences are contradicted by parts of the direct evidence." *State v. Hall*, 2019 ME 126, ¶ 16, 214 A.3d 19 (quotation marks omitted).

[¶22]  There was sufficient evidence in the record to support the jury's verdict that Labbe violated section 210-A.  He contacted the victim multiple times directly by means of a device—his phone as well as others' phones—even after she asked him to stop and then had him served with a protection order. Despite his stated reasons for contacting her, a number of calls and texts did not mention retrieving his clothing or seeing his child; some calls were

14

hang-ups; one involved "dead air" and just breathing. Given the frequency, nature, manner, and timing of these contacts; the victim's relationship and prior history with Labbe; the testimony about the effects of his conduct on the victim's emotional and physical health; and Labbe's prior violations of a court order that prohibited contact with the victim, the jury could have rationally found, as the State charged, that Labbe intentionally or knowingly engaged in a course of conduct directed at or concerning the victim that would cause a reasonable person serious inconvenience or emotional distress, and that Labbe and the victim were family or household members as defined by Maine law.

## C.     *De Minimis* Infraction

[¶23]  Labbe contends that even if his conduct technically violated the statutes at issue, the charges should be dismissed as *de minimis.*

[¶24]  Courts are authorized to dismiss a charge as a *de minimis* infraction "upon notice to or motion of the prosecutor and opportunity to be heard, having regard to the nature of the conduct alleged and the nature of the attendant circumstances"[14] if the court finds that the defendant's conduct

---

[14]  The State argues that Labbe waived this issue by failing to file a written motion in advance of trial and raising it for the first time when he orally moved for a judgment of acquittal at trial. Title 17-A M.R.S. § 12(1) (2023) does not prescribe either the time or the procedure for requesting a *de minimis* dismissal. Rather, section 12 merely prohibits a court from dismissing a charge as a *de minimis* infraction *sua sponte* without providing the prosecutor an opportunity to be heard. *See also* M.R.U. Crim. P. 1(c) ("When no procedure is specifically prescribed, the court shall proceed in

**A.** Was within a customary license or tolerance, which was not expressly refused by the person whose interest was infringed and which is not inconsistent with the purpose of the law defining the crime; or

**B.** Did not actually cause or threaten the harm sought to be prevented by the law defining the crime or did so only to an extent too trivial to warrant the condemnation of conviction; or

**C.** Presents such other extenuations that it cannot reasonably be regarded as envisaged by the Legislature in defining the crime.

17-A M.R.S. § 12(1) (2023). Although trial courts have "broad discretion in determining the propriety of a *de minimis* motion," charges should be dismissed as *de minimis* only in "extraordinary cases." *State v. Kargar*, 679 A.2d 81, 83, 85 (Me. 1996). None of the foregoing grounds support dismissal in this case.

[¶25] In analyzing a *de minimis* motion, courts can consider a number of factors, including

the background, experience and character of the defendant which may indicate whether he knew or ought to have known of the illegality; the knowledge of the defendant of the consequences to be incurred upon violation of the statute; the circumstances concerning the offense; the resulting harm or evil, if any, caused or threatened by the infraction; the probable impact of the violation upon the community; the seriousness of the infraction in terms of punishment, bearing in mind that punishment can be suspended; mitigating circumstances as to the offender; possible improper motives of the complainant or prosecutor; and any other data which may reveal the nature and degree of the culpability in the offense committed by the defendant.

---

any lawful manner not inconsistent with the Constitution of the United States or of the State of Maine, the Maine Rules of Criminal Procedure, these Rules, or any applicable statutes.").

*Id.* at 84 (quotation marks omitted). Courts may also consider, where appropriate, the legislative history and purpose of the underlying criminal statute. *See id.* at 84-85.

[¶26] Labbe argues that it is "difficult to imagine that the Legislature intended for the conduct [he] exhibited" to be encompassed by this statute. As was noted above, *see supra* ¶ 20, Labbe's conduct is precisely the conduct that the Legislature sought to include within the ambit of stalking when it amended the statute in 2007. *See* P.L. 2007, ch. 685, § 3. Thus, the court did not abuse its broad discretion in failing to dismiss the domestic violence stalking charge here as a *de minimis* infraction.

[¶27] Nor did the court abuse its discretion in denying Labbe's request to dismiss as *de minimis* the charges of violation of the protection order. Title 19-A M.R.S. § 4011(1) states that violation of "[a] temporary, emergency, interim or final protective order . . . issued by a court of the United States or of another state" "is a Class D crime when the defendant has prior actual notice . . . of the order." Such orders must be "diligently enforce[ed]" in order to "reduc[e] the abuser's access to the victim." 19-A M.R.S. § 4001(3) (2018).

[¶28] Given the overarching importance for temporary protection from abuse orders to be strictly enforced and to limit an abuser's access to the victim,

*see id.*, and in light of Labbe's background and history with this victim, Labbe's conduct threatened to cause—and did in fact cause—the type of harm that the Legislature intended to prevent when it passed section 4011. Thus, the court did not abuse its discretion in denying Labbe's request to dismiss Counts 2 and 3 as *de minimis. See Kargar*, 679 A.2d at 83-85.

**D.    Evidentiary Rulings**

[¶29]  Next, Labbe contends that the admission of testimony referencing prior court orders and his violation of them was error under Rule 404(b) and an abuse of discretion under Rule 403 of the Maine Rules of Evidence. He further contends that other testimony about his absence for several years prior to the incidents in question as well as the victim's references to when he "got out" and his previous house arrest further compounded the unfair prejudice.

[¶30]  Prior to trial, the State filed a motion in limine seeking admission of evidence detailing Labbe's violations of prior bail orders prohibiting contact with the victim and, separately, evidence referencing his recent release from prison. The trial court granted the motion in part, ruling that it would allow only generic references to a prior "court order" and permit testimony that Labbe had violated the order as relevant to show the victim's state of mind, i.e., that the victim may have been anxious about Labbe's continuing contact even

18

after the temporary protection order had been served. The court ruled that it would also allow evidence that Labbe had been "away" and "out of the area" until November 5, 2019, as relevant to show why the victim had not been fearful of Labbe's contacts until after that date.

[¶31] During the trial, the victim testified that Labbe, at one point in the past, was "supposed to be on house arrest." Defense counsel promptly objected but did not ask for additional relief. The court sustained the objection. The victim also testified that in 2017 a court order was in effect that prohibited Labbe from contacting her, and that Labbe violated it "[n]umerous times." Following the testimony, the court gave a limiting instruction, which it reiterated as part of its final jury instructions:

> That evidence of alleged contact with [the victim] in 2017 was not being offered and you are not to consider it for whether or not [Labbe] has acted in conformity therewith. Such prior conduct, rather, has been offered for and you are to consider it only for the purpose of the effect, if any, the alleged contact may have had on [the victim].

[¶32] Defense counsel's cross-examination elicited testimony from the victim that she had previously promised Labbe that when he "got out" she would give him some money. Labbe did not immediately object, but later moved for a mistrial on the grounds that the victim improperly referenced that

Labbe recently "got out" and that he had been on "house arrest." The court denied the motion.[15]

[¶33] We review for clear error a decision to admit evidence of a prior bad act pursuant to Maine Rule of Evidence 404(b). *State v. Osborn*, 2023 ME 19, ¶ 17, 290 A.3d 558. "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," M.R. Evid. 404(b), but such evidence is admissible "for any other permissible purpose, such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *State v. Pillsbury*, 2017 ME 92, ¶ 22, 161 A.3d 690 (quotation marks omitted). Evidence of prior interactions between a defendant and the victim may be admissible to show the victim's state of mind when the victim's state of mind is at issue and the prior interactions are similar to the charged conduct. *See* Field & Murray, *Maine Evidence* § 404.10 at 155 (6th ed. 2007); *see also State v. Lindsey*, 447 A.2d 794, 796 (Me. 1982) ("The testimony regarding the defendant's two prior attempts to threaten the [victims] was relevant to prove an element of the crime: that they were subjectively and

---

[15] Labbe declined the court's offer to issue a limiting instruction with regard to this testimony and does not appeal the court's denial of his request for a mistrial based on the victim's statements.

objectively justified in feeling fear when the defendant threatened them a third time.").

[¶34]  The court did not commit clear error in admitting evidence that Labbe had violated previous court orders prohibiting him from contacting the victim.  The State was required to prove that Labbe's conduct would cause a reasonable person in the victim's position "serious inconvenience" or "emotional distress."  17-A M.R.S. § 210-A.  Evidence that Labbe had previously violated court orders prohibiting contact was directly relevant to the state of mind of a reasonable person in the victim's position in light of Labbe's persistent texting and calling, which continued after the victim asked him to stop and after the victim had secured a protection order.  *See Lindsey*, 447 A.2d at 796.

[¶35]  Moreover, the court specifically instructed the jury immediately after the victim's testimony and again in its final jury instructions that evidence was to be considered only to determine the effect, if any, the alleged contact may have had on the victim.  *See State v. Pratt*, 2015 ME 167, ¶ 27, 130 A.3d 381 (holding that limiting instructions may be used to mitigate the danger of unfair prejudice where the instruction limits the use of the evidence to a permissible purpose).

[¶36]  Likewise, the court did not abuse its discretion under Rule 403 of the Maine Rules of Evidence in admitting evidence that Labbe had previously violated court orders prohibiting contact with the victim and that Labbe had recently "been away."  "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ."  M.R. Evid. 403.  We review for an abuse of discretion a trial court's decision to admit evidence over a Rule 403 objection.  *State v. Penley*, 2023 ME 7, ¶ 15, 288 A.3d 1183.

[¶37]  Here, the probative value of the evidence was significant: without the evidence in question, the jury could not fully understand why Labbe's conduct leading up to December 3 would cause the victim emotional distress. *Cf. Osborn*, 2023 ME 19, ¶ 20, 290 A.3d 558 (finding no abuse of discretion in the court's admission of evidence of prior drug transactions between the defendant and a confidential informant because, inter alia, the evidence "demonstrated the relevance of other evidence").  Further, the court appropriately limited the description of Labbe's prior conduct, allowing testimony about Labbe's prior violations of conditions of release but only in generic terms.  *See State v. Smith*, 612 A.2d 231, 235 (Me. 1992) (concluding that the trial court properly exercised its discretion in admitting evidence of the

defendant's prior assaults on the victim when the testifying victim did not relate any specific details or instances of those prior assaults). Finally, as noted, the court limited the danger of unfair prejudice by instructing the jury to consider the testimony regarding Labbe's prior court order violations only for "determining the effect, if any, that the alleged conduct may have had on [the victim]." *See also Pratt*, 2015 ME 167, ¶ 27, 130 A.3d 381. Thus, the court did not err in determining that the probative value of the evidence in question was not substantially outweighed by the danger of unfair prejudice resulting from its admission.

**E.     Issues Raised by *Counterman v. Colorado***

[¶38] Again, the questions on which we requested supplemental briefing and argument in the wake of the *Counterman v. Colorado* were the following:

> (1)     What effect, if any, does the U.S. Supreme Court's holding in *Counterman* have on Labbe's case and especially on the State's burden of proof, if any, with respect to the defendant's subjective awareness that his conduct could cause one of the effects enumerated in 17-A M.R.S. § 210-A?

> (2)     In light of principles of issue preservation and retroactivity as set forth in *Griffith v. Kentucky,* 479 U.S. 314 (1987) and similar cases, can and should the Law Court address in this appeal the issues raised by *Counterman*?

We address these questions in reverse order, starting with the issues of retroactivity and preservation.

### 1.    Retroactivity and Preservation Issues

[¶39]  In *Griffith* v. *Kentucky*, the U.S. Supreme Court held that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final."  479 U.S. 314, 328 (1987); *see, e.g., United States v. Lopez-Pena,* 912 F.2d 1542, 1544-45 (1st Cir. 1989) (applying *Griffith* to the defendants' challenge to empanelment of juries by magistrates).  The parties agree that *Griffith v. Kentucky* requires that *Counterman* be applied retroactively to this case.  They disagree, however, on whether Labbe properly preserved a First Amendment challenge.

[¶40]  At no point, either at trial or on appeal, did Labbe challenge the constitutionality of Maine's stalking statute under the First Amendment's freedom of speech clause.[16]  As a result, we would ordinarily consider the issue to be unpreserved.  *See Scott v. Lipman & Katz, P.A.,* 648 A.2d 969, 974 (Me. 1994); *see also State v. Barlow*, 320 A.2d 895, 898 (Me. 1974).  The requirement that an issue be preserved in order for it to be cognizable on appeal also applies in cases that are subject to *Griffith v. Kentucky*'s rule of retroactivity.  *U.S. v. Booker*, 543 U.S. 220, 268 (2005)("[W]e expect . . . courts to apply ordinary

---

[16]  Although Labbe raised a void-for-vagueness argument, he based that argument not on the First Amendment but rather on the due process clause.  *See State v. Witham*, 2005 ME 79, ¶ 7, 876 A.2d 40 (noting that a void-for-vagueness challenge is rooted in the due process clause).

prudential doctrines, . . . for example, whether the issue was raised below."); *see also Shea v. Louisiana*, 470 U.S. 51, 58 n.4 (1985) (noting the rule of retroactivity is "subject . . . to established principles of waiver, harmless error, and the like").

[¶41] Nevertheless, we will address the question of *Counterman*'s effect on the instant case because the application of the new standard announced in *Counterman* may have the potential to affect the outcome. *See United States Nat'l Bank of Oregon v. Indep. Ins. Agents of Am. Inc.*, 508 U.S. 439, 447 (1993) ("[A] court may consider an issue antecedent to . . . and ultimately dispositive of the dispute before it, even an issue the parties fail to identify and brief." (quotation marks omitted)); *see also Sebra v. Wentworth*, 2010 ME 21, ¶ 16, 990 A.2d 538 (holding that this Court will "consider [a] purely legal issue on appeal because its resolution does not require the introduction of additional facts, its proper resolution is clear, and a failure to consider it may result in a miscarriage of justice." (quotation marks omitted)). Also, because the specific provision in Colorado's stalking statute at issue in *Counterman* is similar to Maine's stalking statute (in requiring only objective proof of harm to the victim), clarification is warranted as to the applicability of the *Counterman*'s holding to prosecution under 17-A M.R.S. § 210-A, at least as applied in this case. Maine Prosecutors Assoc. Amicus Br. ("[T]his Court should clarify . . . the test elucidated . . . in

*Counterman*."); *see also Davis v. United States*, 512 U.S. 452, 464 (1994) (Scalia, J., concurring) ("[T]he refusal to consider arguments not raised is a sound prudential practice, rather than a statutory or constitutional mandate, and there are times when prudence dictates the contrary.").

[¶42] Because Labbe failed to preserve his First Amendment challenge, however, we apply the obvious-error standard in reviewing the merits of his appeal. *State v. Anderson*, 409 A.2d 1290, 1304 (Me. 1979); *see State v. True*, 438 A.2d 460, 468-69 (Me. 1981). Under that standard, we will not disturb a judgment unless "there is (1) an error, (2) that is plain, and (3) that affects substantial rights." *State v. Robbins*, 2019 ME 138, ¶ 8, 215 A.3d 788 (quoting *State v. Dolloff*, 2012 ME 130, ¶ 35, 58 A.3d 1032). To affect substantial rights, the error must be sufficiently prejudicial that there is a reasonable probability that it affected the outcome. *Dolloff*, 2012 ME 130, ¶ 37, 58 A.3d 1032. This standard is further heightened for a jury verdict, where the error must also "seriously affect[] the fairness and integrity or public reputation of judicial proceedings." *Id*. at ¶ 35 (quoting *State v. Pabon*, 2011 ME 100, ¶ 29, 28 A.3d 1147).

2. **The Effect of *Counterman v. Colorado* on This Case**

a. **The *Counterman* Decision**

[¶43]  We first discuss the *Counterman* decision.  Over the course of two years, Billy Counterman sent hundreds of Facebook messages to a local musician, Coles Whalen, whom he did not know and had never met. *Counterman*, 600 U.S. at 70.  Although Whalen blocked his account and never responded to his messages, Counterman created new accounts and persisted in messaging her.  *Id.*  Some of Counterman's messages suggested that he was surveilling her—"[w]as that you in the white Jeep?" and "[a] fine display with your partner."  *Id.* (quotation marks omitted)  Others were at least impliedly threatening—"[f]uck off permanently," "[s]taying in cyber life is going to kill you," and "[y]ou're not being good for human relations. Die."  *Id.* (quotation marks omitted). Whalen was "fearful that [Counterman] was following her; and was afraid [she] would get hurt."  *Id.* (quotation marks omitted).  She suffered from "severe anxiety," "stopped walking alone, declined social engagements, and canceled some of her performances."  *Id.*

[¶44]  After Whalen reported this to authorities, Counterman was charged with two counts of stalking and one count of harassment.  *People v. Counterman,* 497 P.3d 1039, 1043 (Colo. App. 2021).  The State dismissed one of the stalking counts and the harassment count and proceeded to trial on the remaining count of stalking under a provision in the Colorado stalking statute

making it unlawful to "[r]epeatedly . . . make[] any form communication with another person" in "a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person . . . to suffer serious emotional distress." Colo. Rev. Stat. § 18-3-602(1)(c)(2022); [17] *see id*. at 1043-44.

[¶45] Counterman moved to dismiss the remaining stalking charge on First Amendment grounds, arguing that his messages were not "true threats" and the statute therefore criminalized protected speech. The trial judge denied the motion, ruling that "I believe that [Counterman's] statements rise to the level of a true threat, although ultimately that will be a question of fact for the jury to decide." *Id.* at 1045. After trial, the jury found Counterman guilty of the stalking charge. *Id.* at 1044-45.

[¶46] Counterman appealed to the Colorado Court of Appeals, asserting that the statute was unconstitutional as applied to his statements because they were protected speech, not unprotected "true threats." *Id.* The Colorado Court

---

[17] As relevant here, section 18-3-602(1)(c) reads as follows:

> A person commits stalking if directly, or indirectly through another person, the person knowingly [and] [r]epeatedly follows, approaches, contacts, places under surveillance, or *makes any form of communication* with another person . . . that would cause a reasonable person to suffer serious emotional distress and does cause that person . . . to suffer serious emotional distress.

Colo. Rev. Stat. § 18-3-602(1)(c)(2022) (emphasis added).

of Appeals addressed the merits of the "true threats" issue directly and affirmed the conviction, holding that "Counterman's messages were true threats— threats that are not protected speech under the First Amendment . . . [a]nd as such, Counterman's as-applied challenge to section 18-3-602(1)(c) fails." *Id*. at 1049. After the Colorado Supreme Court declined to hear the case, the Supreme Court granted certiorari and vacated the conviction. *Counterman*, 600 U.S. at 72.

[¶47] Writing for the Court, Justice Kagan framed the issues narrowly as "(1) whether the First Amendment requires proof of a defendant's subjective mindset in true-threats cases,[18] and (2) if so, what *mens rea* standard is sufficient." *Id*. at 72. The Court answered these questions by concluding that in a true threats case, the First Amendment requires proof that a defendant "had some subjective understanding of the threatening nature of his statements . . . [and] that a mental state of reckless is sufficient." *Id.* at 69. "The State must show that the defendant consciously disregarded a substantial risk that his

---

[18] "True threats" are "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black,* 538 U.S. 343, 359 (2003). Whether a statement is determined to be a true threat depends upon an objective test, not upon the mental state of the speaker but on "'what the statement conveys' to the person on the receiving end." *Counterman v. Colorado*, 600 U.S. 66, 74 (quoting *Elonis v. United States,* 575 U.S 723, 733 (2015)). If a statement is a true threat under this standard, it is not protected by the First Amendment. *See Childs v. Ballou,* 2016 ME 142, ¶ 17, 148 A.3d 291.

communications would be viewed as threatening violence." *Id.* Because Counterman was prosecuted only in accordance with an objective standard and the State "did not have to show any awareness on his part that the statements could be understood [as threats]," the Colorado stalking statute as applied in that case violated the First Amendment. *Id*. at 82-83.

### b. Application of *Counterman* to Labbe's Case

[¶48] Labbe contends that "under the holding in *Counterman,* Maine's [stalking] statute is unconstitutional as it stands[] because it does not require a subjective mens rea to establish the crime." Labbe's contention is wide of the mark, for several reasons. First, as noted, *Counterman* did not hold that that the Colorado stalking statute was facially unconstitutional; it was an as-applied challenge based on the specific facts in, and posture of, that case. To the extent that he relies on *Counterman* (or on any other reason) to argue that the Maine stalking statute is facially unconstitutional, the argument does not stand.[19]

[¶49] Second, the Supreme Court in *Counterman* distinctly and narrowly framed the issue as whether the First Amendment required the State to prove a defendant's subjective *mens rea in a true threats case,* and if so, what *mens rea*

---

[19] A facial challenge requires demonstrating that the statute is "incapable of any valid application." *State v. Events Int'l, Inc.*, 528 A.2d 458, 460 (Me. 1987) (quotation marks omitted); *see also Conlogue v. Conlogue,* 2006 ME 12, ¶ 5, 890 A.2d 691. That is clearly not the case with 17-A M.R.S. § 210-A(1)(a)(1).

30

standard was sufficient. In such a case, the *content* of a defendant's speech is the central focus of the inquiry, and the inquiry is whether the speech's content is a "serious expression[ ] conveying that a speaker means to commit an act of unlawful violence." *Id*. at 74 (quotation marks omitted). Thus, the Supreme Court concluded that the State was required to prove that Counterman at least had a subjective awareness of the *effects of his words* upon the victim and reliance on an objective standard to measure the effect on the victim did not provide sufficient First Amendment protection for the speaker.

[¶50] Some stalking prosecutions, like Counterman's, may rely in whole or in part on words used by a defendant to establish the "course of conduct" and consequent effect upon the victim. It does not follow, however, that the *Counterman* standard applies to every stalking prosecution in which words are spoken or electronic communication devices are used.[20] Rather, *Counterman*'s

---

[20] In her concurring opinion in *Counterman v. Colorado*, Justice Sotomayor emphasized this very point by noting that the true threats doctrine "came up below only because of the lower courts' *doubtful assumption* that [Counterman] could be prosecuted only if his actions fell under the true threats exception" and stating, "I do not think that is accurate, given the lessened First Amendment concerns at issue." *Id.* at 86 (emphasis added). She added:

> This kind of prosecution raises fewer First Amendment concerns for a variety of reasons. Stalking can be carried out through speech but need not be, which requires less First Amendment scrutiny when speech is swept in. The content of the repeated communications can sometimes be irrelevant, such as persistently calling someone and hanging up, or a stream of utterly prosaic communications. Repeatedly forcing intrusive communications directly into the personal life of an unwilling recipient also enjoys less protection.

holding is clear: where the State relies on the content of a defendant's expression as the basis for a stalking charge and to establish harm to the victim, the additional requirement to prove subjective *mens rea* of recklessness applies.[21]

[¶51]  That is not so in Labbe's case.  The "course of conduct" for which he was indicted and convicted involved a series of electronic communications—phone calls and texts—to the victim during a period of several weeks.  Viewed in the context of the record as a whole, the stalking charge here was not predicated on the content of those communications but rather on the act of communicating itself—the repeated, unwelcome *contact* carried out through electronic devices—even after he was asked to stop; even after his possessions were returned; and even after he had been served with a protection order prohibiting him from having any direct or indirect contact

---

*Id.* at 85-86 (citation and quotation marks omitted).  And the risk inherent in true threats cases— where "with a single intemperate utterance . . . a speaker will accidentally or erroneously incur liability . . . is far reduced with a course of repeated unwanted contact."  *Id.* at 86 (citation and quotation marks omitted).  It bears noting, though, that Justice Sotomayor voiced clear support for a *higher mens rea* standard in true threats cases generally and ultimately concurred with the majority's adoption of a recklessness *mens rea* standard for true threats stalking cases because of diminished First Amendment concerns.  *See id.*

[21]  Admittedly, the line separating a stalking prosecution based on the threatening content of a defendant's speech (in whole or part) from a stalking prosecution based on conduct may not be clear in some instances and will need to be scrutinized carefully in each case.  The former would require, per *Counterman,* the State to prove the additional *mens rea* element of at least recklessness; the latter would not.

with the victim.[22]  It was Labbe's actions, not his words, that constituted the "course of conduct" for which he was convicted and which caused the victim "to suffer serious inconvenience or emotional distress."    17-A M.R.S. § 210-A(1)(A)(1).

[¶52]  This is plainly evident from the record.  The content of the calls and messages was not threatening ("utterly prosaic"); some were devoid of meaningful content; some were unanswered or were merely hang-ups; one consisted of dead air and just breathing.[23]

[¶53]  In its opening statement, closing argument, and rebuttal argument, the State focused on "defendant's behavior" and recounted the victim's testimony about Labbe's "non-stop calling [and] texting despite being told to stop, stop texting me, stop contacting me, blocking him on social media."  After

---

[22]  As mentioned earlier, the Maine Legislature, in broadening the definition of stalking in its 2007 amendments to 17-A M.R.S. § 210-A, was particularly concerned about, and intended to capture, the "use of new technologies."  P.L. 2007, ch. 685, § 3.  Maine's Domestic Abuse Homicide Review Panel, in reviewing stalking cases that have led to homicides, found that social media and other forms of electronic communications, including email and texting, were used not to communicate specific threats but as a pervasive way to maintain a presence in the victim's life.  *See* Maine Commission on Domestic and Sexual Abuse, *The 13th Biennial Report: 20 Year Lookback* 17 (2021).

[23]  Three of the messages that Labbe sent conceivably could be viewed as implied threats.  He messaged the victim at one point, "I hope your boyfriend is a cop, ha ha ha."  The victim testified that Labbe said to the boyfriend that "he (Labbe) should break his (the boyfriend's) legs."  He texted the victim, "[You're] gonna to fuck yourself over in the courts."  The State did not specifically rely upon or highlight these statements as part of its case against Labbe.  Even if the content of any or all of these statements is sufficient to constitute a true threat and thus generates a *Counterman* issue, the court's failure to require proof of the *mens rea* of recklessness does not rise to the level of obvious error in this case.

Labbe was served with the protection order, "[h]e [did not] change any of his behavior. . . . [The victim] continue[d] to get numerous private calls, numerous calls . . . [and] each one of those is a violation of a protective order." The fact that the contacts continued after he was served with the protective order (and convicted of two such violations in the same case) independently bolsters the State's proof of the elements of stalking under 17-A M.R.S. § 210-A(1)(A)(1) ("[I]ntentionally or knowingly engag[ing] in a course of conduct directed at . . . a specific person that would cause a reasonable person . . . to suffer serious inconvenience or emotional distress.").

[¶54] Labbe contends that his "benign non-threatening statements" were far less troubling than Counterman's and that "there was no way for [Labbe] to know or intend" that his statements were "threatening or . . . would cause emotional distress," and therefore his conviction is unconstitutional. In other words, he contends that because his words did not rise to the level of true threats, the First Amendment shields him from the reach of the stalking statute.

[¶55] But this argument misses the point. Labbe's actions—not his words—carried out through electronic communication devices constituted the "course of conduct" that caused the victim's distress. The content of the messages may have been relevant to show that Labbe had no legitimate reason

for contacting the victim after a certain point or to identify that he was the sender, but what was said was not material to the course of conduct that established the basis for the stalking charge. And the post-protection-order contacts alone, particularly in light of the parties' history, belie Labbe's contention that he could not have known that the continued calls and texts would distress the victim.

[¶56] Moreover, "[t]he First Amendment does not provide a wall of immunity for tortious or criminal conduct, and does not compel one to submit to unwanted or detrimental association with another." *Childs v. Ballou,* 2016 ME 142, ¶ 19, 148 A.3d 291 (quotation and citation omitted); *see also Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) ("[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated . . . or carried out by means of language."). And "[n]othing in the Constitution compels us to listen to or view any unwanted communication, whatever its merit." *Rowan v. U.S. Post Off. Dept.*, 397 U.S. 728, 737 (1970).

[¶57] As noted above, we are reviewing the merits of Labbe's appeal on this issue under the obvious-error standard, which requires that there be (1) an error (2) that is plain and (3) that affects substantial rights, meaning that the

error must be sufficiently prejudicial that there was a reasonable probability that it affected the outcome. *Dollof,* 2012 ME 130, ¶¶ 35, 37, 58 A.3d 1032. Even retroactively applying the holding in *Counterman v. Colorado*, we conclude that in the circumstances presented by this case, the State was not required to prove *mens rea* of recklessness on Labbe's part—that is, that he recklessly disregarded the effect that his words have upon the victim—and that the trial court did not err by failing to so instruct the jury.[24] This case was not about the contents of Labbe's statements; it was about persistent, unwelcome contact via electronic communication devices, even after being legally ordered not to have any contact. Moreover, to the extent that any of Labbe's statements could be viewed as a true threat, thus prompting the need for a *Counterman* instruction, any plain error was not sufficiently prejudicial in light of the record as a whole, particularly where the post-protection-order contacts alone would have supported his conviction.

[¶58] We affirm the court's judgment of conviction on Count 1, 2, and 3.

---

[24] We note that Labbe was not charged with terrorizing or domestic violence terrorizing, 17-A M.R.S. §§ 210, 210-B (2023), criminal offenses that are based directly on the content of the defendant's speech, that are defined without any *mens rea* requirement, and that impose criminal liability for threats of criminal violence that have "the natural and probable consequence" of inducing fear in the person threatened or the person who heard the threat, "whether or not such consequence in fact occurs*." Id*. We are therefore not called upon to decide whether Maine's terrorizing and domestic violence terrorizing statutes comport with *Counterman.*

36

The entry is:

> Judgment affirmed. The trial court is directed to amend the docket and the judgment and commitment to correctly reflect that, as to Count 1, Labbe was convicted of a Class C offense under 17-A M.R.S. § 210-C(1)(B)(3).

---

Verne E. Paradie, Jr., Esq. (orally), Lewiston, for appellant Jacob R. Labbe Sr.

Neil E. McLean Jr., District Attorney, and Katherine M. Hudson-MacRae, Asst. Dist. Atty. (orally), Prosecutorial District III, Lewiston, for appellee State of Maine

Aaron M. Frey, Attorney General, and Laura A. Yustak, Asst. Atty. Gen., Office of the Attorney General, Augusta, for amicus curiae Office of the Attorney General

Melissa L. Martin, Esq., Maine Coalition Against Sexual Assault, Augusta, for amicus curiae Maine Coalition Against Sexual Assault

Andrea Mancuso, Esq., Maine Coalition to End Domestic Violence, Augusta, for amicus curiae Maine Coalition to End Domestic Violence

Lawrence C. Winger, amicus curiae pro se

Maeghan Maloney, Esq., and Jacob Demosthenes, Esq., Maine Prosecutors Association, Augusta, for amicus curiae Maine Prosecutors Association

Matthew R. Segal, Esq., American Civil Liberties Union Foundation, Boston, Massachusetts, and Carol Garvan, Esq., and Zachary Heiden, Esq., American Civil Liberties Union of Maine Foundation, Portland, for amici curiae American Civil Liberties Union and American Civil Liberties Union of Maine